IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | | |
|---|---|---|
| OCEAN MAMMAL INSTITUTE, et al., | ) ) ) | CIVIL NO. 07-00254 DAE-LEK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| ROBERT M. GATES, et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION; AND ORDER
SETTING INJUNCTION

On February 11, 2008, the Court heard Plaintiffs' Motion for

Preliminary Injunction.  Paul H. Achitoff, Esq., and Koalani L. Kaulukukui, Esq.,

appeared at the hearing on behalf of Plaintiffs; Luther L. Hajek and S. Jay

Govindan of the Department of Justice appeared at the hearing on behalf of

Defendants.  After reviewing the motion and the supporting and opposing

memoranda, the Court GRANTS IN PART and DENIES IN PART Plaintiffs'

Motion and ORDERS the injunction described herein to issue effective

immediately.

BACKGROUND

I. Factual and Procedural History

On January 23, 2007, the Navy issued a Programmatic Environmental Assessment/Overseas EA ("First EA") for its proposal to conduct up to twelve undersea warfare exercises ("USWEX") in the Hawaiian Islands Operating Area between January 2007 and January 2009.  USWEX is a series of advanced anti-submarine warfare ("ASW") exercises to be conducted by deploying west-coast based strike groups and Hawai'i ported ships.  (First EA, Ex. 4 at 1-1, attached to Pls.' Mot. for Prelim. Inj.)  The objective of USWEX is to enhance the proficiency of naval surface, subsurface, and air forces to counter the threat of quiet enemy submarines in coastal waters.  (Id.)

During USWEX, one to five surface ships, equipped with mid-frequency active ("MFA") sonar and with the aid of helicopters and aircraft, coordinate a search for one or more submarines.  (Id. at 2-3.)  Each exercise lasts roughly 72 to 96 hours and involves between 139.5 and 222 hours of active MFA sonar use.  (Id.)  MFA sonar is currently the most effective method for detecting quiet diesel-electric submarines used by potentially hostile nations.  (Unclassified Decl. of David Yoshihara ¶¶ 6-11 ("Unclassified Yoshihara Decl."), attached to Defs.' Mot. in Opp.'n.)  The United States Navy considers training intensively in

realistic conditions at sea is to be critical for developing MFA sonar skills and preparing for conditions that would be encountered in actual combat conditions. (Id. ¶¶ 21-22.)  Specifically, training in the Hawai'i range provides unique value that cannot be replicated elsewhere and allows deploying strike groups to hone their sonar and other tactical skills prior to entering potentially hostile waters.  (Id. ¶ 21.)

Active sonars generate and emit acoustic energy in order to obtain information about a distant object from the reflected sound energy.  (First EA at 2-5.)  Advanced MFA sonar involves the discharge of omnidirectional "pings" and then the rapid scanning of a receiving beam to provide directional and range information.  (Id.)  While different kinds of MFA sonar units are proposed to be utilized during USWEX, the most powerful ones, on surface ships, generate sounds up to 235 decibels (dB).[1]  (Id.)

---

[1]      Sound is a wave of pressure variations propagating through a medium. Acousticians have adopted a logarithmic scale for sound intensities, which is denoted in dB.  Decibel measurements represent the ratio between a measured pressure value and a reference pressure value.  The logarithmic nature of the scale means that each 10 dB increase is a ten-fold increase in power (e.g., 20 dB is a 100-fold increase, 30 dB is a 1,000-fold increase).  Humans perceive a 10 dB increase in noise as a doubling of sound level, or a 10 dB decrease in noise as halving a sound level.

Because of the different densities of air and water and the different decibel standards in air and water, a sound with the same intensity in air and in

Marine mammals, notably whales and dolphins, have a keen sense of hearing that allows them to forage for food, find mates, bond with offspring, communicate, navigate, and avoid predators.  At least 26 species of marine mammal frequent Hawai'i's waters, the most abundant of which are rough-toothed dolphins, dwarf sperm whales, Fraser's dolphins, and sperm whales.  Seven species listed as endangered occur in the area, including the humpback whale, North Pacific right whale, sei whale, fin whale, blue whale, sperm whale, and Hawaiian monk seal.  (First EA at 4-40).  Every year between November and April, thousands of humpback whales migrate to Hawaiian waters to breed, calve, and nurse their young.  (January 23, 2007 Biological Opinion ("First BiOp"), Ex. 5 at 25, attached to Pls.' Mot. for Prelim. Inj.)

High level acoustic exposures have been demonstrated to adversely affect marine mammals, resulting in injuries including ruptured hearing organs, behavior modification, and, arguably, the accumulation of harmful nitrogen gas embolisms from rapid surfacing.  It is alleged that MFA sonar may have been a causative factor in a number of mass stranding events involving marine mammals

---

water would be approximately 63 dB quieter in air.  Thus, a sound that is 160 dB loud underwater would have the same effective intensity as a sound that is 97 dB loud in air.  (9/26/07 Biological Opinion ("Revised BiOp"), Ex. 9 at 13-14, attached to Defs.' Mot. in Opp'n.)

occurring over the past decade.  The use of MFA sonar is considered a plausible, if

not likely, contributing factor to a mass stranding of up to 200 melon-headed

whales in Hanalei Bay, Kauai, following naval exercises conducted by U.S. and

Japanese vessels during Rim of the Pacific exercises ("RIMPAC") 2004.

(Hawaiian Melon-headed Whale Mass Stranding Event of July 3-4, 2004 ("Hanalei

Report"), Ex. 8 at 2, attached to Pls.' Mot. for Prelim. Inj.)  The Navy and National

Marine Fisheries Service's ("NMFS") investigation of a 2000 mass stranding in the

Bahamas concluded that Navy sonar was the most plausible source of trauma.

(Joint Interim Rep. Bahamas Marine Mammal Stranding ("Bahamas Report"), Ex.

7 at ii, attached to Pls.' Mot. for Prelim. Inj.)

          The Navy's First EA examined potential acoustic effects on marine

mammals based on criteria set forth in the Marine Mammal Protection Act

("MMPA") and the Endangered Species Act ("ESA") for military readiness

activities.  (First EA at 4-12.)  Level A harassment includes any act that injures or

has the significant potential to injure a marine mammal or marine mammal stock in

the wild.  (Id.)  Level B harassment is defined as any act that disturbs or is likely to

disturb a marine mammal or marine mammal stock in the wild by causing

disruption of natural behavioral patterns, including, but not limited to, migration,

surfacing, nursing, breeding, feeding, or sheltering to a point where such

behavioral patterns are abandoned or significantly altered.  (Id.)  The First EA classified effects leading to physical injury or harm ("Permanent Threshold Shift" or "PTS"), such as permanent or temporary hearing loss, as Level A harassment, and classified effects causing temporary behavioral disruption or harassment ("Temporary Threshold Shift" or "TTS") as Level B harassment.  (Id. at 4-13.) Based primarily on studies conducted on captive animals, the First EA proposed a Level A threshold of between 195 to 215 dB, a Level B threshold of between 190 and 195 dB, and a sub-TTS or non-behavioral disturbance level of 190 dB or less. (Id. at 4-13 - 4-14.)  In light of the growing body of literature suggesting that wild, naïve marine mammals are behaviorally affected at significantly lower levels than captive animals, NMFS, however, recommended a sub-TTS level of 173 dB.  (Id. at 4-15.)

The First EA considered both the Navy's and NMFS' alternative levels.  Using NMFS' 173 dB criteria and without factoring in mitigation measures, the First EA concluded that there would be a total of 30,699 sub-TTS marine mammal exposures, 222 TTS exposures, and no PTS exposures per year. (Id. at 4-24.)  Using the Navy's 190 dB threshold, the First EA found that there would be 1,585 sub-TTS exposures and the other numbers remained static.  (Id. at 4-25)

On January 23, 2007, NMFS issued the First BiOp, determining that USWEX was not likely to jeopardize the continued existence of threatened or endangered species.  (First BiOp at 79.)  NMFS also issued an Incidental Take Statement ("ITS"), which authorized the "take" of 11,299 endangered whales per year.[2]  (Id.)  NMFS determined that this level of anticipated take was not likely to result in jeopardy to the species.  (Id.)  The ITS set forth terms and conditions by which the Navy had to comply including but not limited to: (1) the implementation of measures reducing the probability of exposures; (2) the development of a monitoring program (by March 31, 2007) to provide an estimate of actual exposure events, observable responses by marine mammals, and the effectiveness of the Navy's mitigation measures; and (3) an obligation for the Navy to continue to consult with NMFS regarding MFA sonar and its effects on marine mammals.  (Id. at 79-80.)

On February 2, 2007, the Navy issued its first Finding of No Significant Impact ("First FONSI") for USWEX.  The First FONSI concluded that the exercises would result in: (1) no significant impacts to biological or cultural

---

[2]     The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

resources under the National Environmental Policy Act ("NEPA"); (2) no significant harm to resources in the global commons under Executive Order 12114; (3) no destruction or adverse modification of any critical habitat in accordance with the Endangered Species Act; (4) a potential for Level B harassment of marine mammals (with negligible effects on marine mammal species or stocks); (5) a "may affect" determination for endangered species; (6) no adverse impact to essential fish habitat in accordance with the Magnuson-Stevens Fishery Conservation and Management Act; and (7) consistency to the maximum extent practicable with the Hawai'i Coastal Zone Management Program, Chapter 205A, Hawai'i Revised Statutes ("HRS").  (First FONSI, Ex. 3 at 3, attached to Pls.' Mot. for Prelim. Inj.)

During April of 2007, the Navy conducted two of its proposed six annual USWEXs in Hawaiian waters.  Shortly thereafter, two pygmy sperm whales washed up on Hawaiian beaches, one on the island of Lanai and one on Maui.  On May 16, 2007, Plaintiffs filed a Complaint for Declarative and Injunctive Relief, alleging that Defendants violated NEPA, 42 U.S.C. §§ 4321-4370(f), the ESA, 16 U.S.C. §§ 1531-1599, the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451-1466, and the National Marine Sanctuaries Act ("NMSA"), 16 U.S.C.

§§ 1431-1445c-1.[3]

On August 22, 2007, Plaintiffs filed the instant Motion for

Preliminary Injunction (Doc. # 15), in which they argue that they had a high

likelihood of success on each of their four claims, the harm from USWEX was

potentially irreparable, and that an injunction should therefore issue.  Specifically,

Plaintiffs contend that: (1) the Navy failed to provide NEPA required public notice

and opportunity to comment on the First EA; (2) the Navy's EAs are substantively

flawed and inadequate; (3) the Navy must prepare an Environmental Impact

Statement ("EIS"); (4) NMFS' First BiOp was inadequate; (5) the Navy ignored

mandatory consistency procedures under the CZMA; and (6) the Navy's use of

MFA sonar is not exempt from the NMSA consultation requirement.

On September 17, 2007, Defendants filed a Motion to Defer Briefing

Schedule ("Motion to Defer") (Doc. # 20) on the Injunction Motion pending the

completion of a public comment period to be initiated on the First EA and the

issuance of a revised EA on or around October 15, 2007.  On September 20, 2007,

this Court heard Defendants' Motion to Defer and established a briefing schedule

that allowed the parties to defer briefing on Plaintiffs' NEPA claims until after the

---

[3]      At the February 11, 2008 hearing, Plaintiffs withdrew their ESA claim
as a basis for the Injunction Motion.  As such, the Court does not discuss the ESA
claim here.

completion of the revised EA.

The Navy opened a public comment period for the First EA on September 21, 2007, and, on September 26, 2007, issued the Revised BiOp, which corrected what NMFS called "minor inconsistencies and errors" contained in the First BiOp.[4]  (Revised BiOp at 2-3.)  The Revised BiOp came to the same substantive conclusions and included the same terms and conditions for the ITS.  (Id. at 78-82.)  Pursuant to the Court's briefing schedule, Defendants filed their motion in opposition to Plaintiffs' Injunction Motion on September 27, 2007 (Doc. # 27), discussing all but Plaintiffs' NEPA claims.  Plaintiffs replied on October 4, 2007 (Doc. # 37).

On October 15, 2007, the Navy issued a new EA ("Revised EA") and FONSI ("Revised FONSI").  The Revised EA clarified and revised the First EA's

--------

[4]        Some of these errors include: (1) references to the incorrect number of proposed USWEX events; (2) estimates that 7,013 individual humpback whales might be subject to sonar pulses of between 173 and 195 dB one time (even though there is only an estimated 4,005 humpback whales in the action area); (3) incorrect references to humpback whales being exposed to levels in the 173 - 195 dB range when the correct reference was actually to levels in the 195-215 dB range; (4) the exclusion of "not" from the conclusion that behavioral responses resulting from sonar transmissions "are expected to affect the reproduction, survival, or recovery of these species;" (5) a reference to gradually increasing sound levels ("ramping up") as a possible mitigation measure, even though this is not normally applicable to MFA sonar use due to the short duration of the "ping;" and (6) failure to include some cited references in the "Literature Cited" section.  (Revised BiOp at 2-3.)

analysis of the CZMA and contained analysis of the potential environmental

impacts of USWEX based on the public comments received on the First EA.

(Revised EA, Ex. 13 at es-1, attached to Pls.' Mot. for Prelim. Inj.)  The Revised

FONSI indicated that the Navy had received 11 submissions containing

approximately 97 comments, which were subsequently analyzed and incorporated

into the analysis of the Revised EA.  (Revised FONSI, Ex. 15 at 5 (page numbers

supplied by Court), attached to Pls.' Mot. for Prelim. Inj.)  The Navy determined

that none of the comments altered its January 2007 determination that USWEX

would not have a significant effect on the quality of the human environment.  (Id.)

The Revised EA and FONSI concluded that there was no threat of significant harm

to the environment and, thus, an EIS was not required.  (Id.)

On October 18, 2007, the Honolulu Council of the Navy League (the

"Navy League") asked the Court for leave to file an amicus curiae brief, which this

Court granted.  In its brief, the Navy League argued that the MMPA was intended

to be the exclusive vehicle for protecting marine mammals and therefore displaced

NEPA and other environmental statutes, thus depriving the Court of jurisdiction

on the instant matter.  The Court, on November 1, 2007, ordered the parties to brief

the issues raised by the Navy League by November 9, 2007.[5]

On November 1, 2007, Plaintiffs filed their Supplemental Motion for Preliminary Injunction (Doc. # 45) addressing the Revised EA and associated NEPA issues. On November 7, 2007, Defendants filed their opposition (Doc. # 48), also addressing the deferred NEPA issues. Plaintiffs replied on November 14, 2007 (Doc. # 57).

A hearing on Plaintiffs' Motion for Preliminary Injunction was scheduled for November 20, 2007. On November 15, 2007, however, Defendants informed the Court that the November USWEX had concluded and that the next USWEX was not scheduled until summer of 2008. Accordingly, the Court denied without prejudice Plaintiffs' motion for preliminary injunction as moot on November 16, 2007 (Doc. # 61) ("November Order").

On January 3, 2008, the Court held a status conference, at which Defendants stated that the USWEX schedule had been revised and that the next exercise would occur in March 2008. That same day, the Court, via minute order (Doc. # 64), set aside the November Order, reinstated the Injunction Motion, and

_____

[5]     Plaintiffs and Defendants agree that the issues raised by the Navy League's amicus brief are not controlling in the instant litigation. The Court adopts the parties' reasoning as to why the Navy League's substantive arguments fail.

set it for hearing on February 11, 2008.  In addition, the Court set a supplemental

briefing schedule regarding discovery and potential mitigation measures.  At the

February 11, 2008 hearing, this Court provided the parties with a list of written

questions for further briefing.  Defendants submitted their response to the Court's

questions on February 15, 2008 (Doc. # 89) and the Plaintiffs submitted their

response on February 20, 2008 (Doc. # 92).

II.  NRDC v. Winter II Background[6]

       In NRDC v. Winter, CV-00335-FMC, 2007 WL 2481037, ("Winter

II")[7] environmental groups brought an action against the Secretary of the Navy and

other federal defendants seeking declaratory and injunctive relief against the

Navy's use of MFA sonar in training exercises proposed to occur in the coastal

waters of California.  On June 22, 2007, the plaintiffs filed a motion for

preliminary injunction.  On August 7, 2007, the California District Court issued a

---

[6]       The Court includes this information because of the factual similarities
between the instant litigation and the Winter II case.  Additionally, the Ninth
Circuit has made several rulings in Winter II that partially guide this Court's
consideration of the instant motion.  The Court notes, however, that due to the
marked difference in strategic locations, there are also significant differences
between the factual backgrounds of the Winter II case and the instant case.

[7]       This case is referred to as Winter II because it is the second case filed
in the California district court involving the same parties.  The first case,
hereinafter known as Winter I, will be discussed in more detail below.

broad blanket preliminary injunction blocking the proposed training exercises.  The

Navy appealed and moved for an emergency stay pending appeal.  A motions panel

of the Ninth Circuit issued the emergency stay of the district court ruling, finding

that the district court erred: (1) in not giving proper weight to the public interest of

war preparedness, and; (2) in fashioning, and failing to explain, an overly broad

absolute injunction not narrowly tailored to achieve a balancing of the equities of

the parties.  NRDC v.  Winter, 502 F.3d 859 (9th Cir. 2007).

On November 13, 2007, a different panel of the Ninth Circuit vacated

the stay and held that a narrowly tailored injunction setting forth additional

mitigation measures to reduce the harmful effects of MFA sonar while still

allowing the Navy to conduct the scheduled training was appropriate.  The Ninth

Circuit remanded the matter to the district court instructing it to narrow its

injunction appropriately, while keeping the emergency stay in place for a training

exercise that was currently ongoing or for ten days from the date of the order,

whichever was earlier.  NRDC v. Winter, 508 F.3d 885 (9th Cir. 2007).

On January 3, 2008, the district court issued a modified preliminary

injunction.  NRDC v. Winter, – F. Supp. 2d –, 2008 WL 158330.  On January 9,

2008, the Navy moved for a stay of the injunction pending appeal, arguing that

many of the mitigation measures imposed by the injunction prevented effective

training.  On January 10, 2008, the district court issued a revised order, adding

specific exceptions to some of the mitigation measures.  On January 14, 2008, the

district court denied the Navy's motion for stay pending appeal.

The Navy appealed the district court's modified injunction and, on

January 15, 2008, requested an immediate stay from the Ninth Circuit.  Earlier that

day, President Bush signed an exemption under the CZMA, 16 U.S.C.

§ 1456(a)(1)(B), and the Council of Environmental Quality ("CEQ") approved

emergency alternative arrangements under its NEPA regulations, 40 C.F.R.

§ 1506.11.  The Ninth Circuit immediately remanded the stay motion to the district

court.  See NRDC v. Winter, – F.3d –, 2008 WL 170312 (9th Cir. January 16,

2008).  Later that day, the Navy moved to vacate the preliminary injunction or, in

the alternative, a partial stay in the district court relative to certain mitigation

measures.  The district court granted that motion on an interim basis and set a

briefing schedule on the Navy's motion to vacate the injunction.  (NRDC v.

Winter, 8:07-cv-00335-FMC-FMOx, Ex. 22, attached to Defs. Second

Supplemental Opp. to Pls.' Mot. for Prelim. Inj.)  The plaintiffs filed an opposition

to the motion to vacate on January 22, 2008, challenging both the Presidential

exemption and the CEQ's action.  The Navy replied on January 25, 2008, and oral

argument occurred on January 30, 2008.  On February 4, 2008, the district court

15

denied the Navy's motion to vacate or stay the injunction.  See NRDC v. Winter,

No. 8:07-cv-00335-FMC-FMOx, 2008 WL 314192 (C.D. Cal. Feb. 4, 2008).  The

Navy noticed its appeal on February 6, 2008.[8]  Oral argument on this appeal

occurred on February 27, 2008.

STANDARD OF REVIEW

I.  Injunctive Relief Standard

Injunction is an equitable remedy, the issuance of which is appropriate

only where the intervention of a court of equity is essential in order to protect

property rights against injuries otherwise irremediable.  Weinberger v. Romero-

Barcelo, 456 U.S. 305, 311-12 (1982).  Where plaintiff and defendant present

competing claims of injury, the traditional function of equity has been to arrive at

an adjustment and reconciliation between the competing claims.  Hecht Co. v.

Bowles, 321 U.S. 321, 329 (1944).  In such cases, the court "balances the

conveniences of the parties and possible injuries to them according as they may be

---

[8] The primary issues before the Ninth Circuit are: (1) the constitutionality of the Presidential exemption issued under the CZMA, (2) the validity of CEQ's implementation of alternative arrangements for the Navy to comply with NEPA until the EIS for the Southern California Range Complex is complete, (3) whether the actions of the President, CEQ, and the Navy required vacatur of the district court's preliminary injunction on the basis that the legal grounds for the injunction had been removed, and (4) whether the mitigation measures imposed on the Navy by the district court were narrowly tailored.

16

affected by the granting or withholding of the injunction." <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944).  "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould [sic] each decree to the necessities of the particular case." <u>Hecht v. Bowles</u>, 321 U.S. at 329.

The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies.  <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d 630, 641 (9th Cir. 2004) (quoting <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 542 (1987)).  The Ninth Circuit has established criteria for the issuance of injunctions.  Under the traditional method, a court may grant a preliminary injunction if a plaintiff shows: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4) advancement of the public interest (in certain cases).  <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 442 F.3d 1147, 1158 (9th Cir. 2006).

Alternatively, a court may grant a preliminary injunction if a plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable harm or that serious questions are raised and the balance of hardships tips sharply in his favor.  <u>Id.</u>  These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases

17

as the probability of success decreases.  <u>Natural Res. Def. Council, Inc. v. Winter</u>, No. 07-56157, 2007 WL 2481465, at *2 (9th Cir. Aug. 31, 2007).  They are not separate tests but rather the outer reaches of a single continuum.  <u>Id.</u>

In issuing an injunction the court must balance the equities between the parties and give due regard to the public interest.  <u>High Sierra Hikers Ass'n</u>, 390 F.3d at 642 (citing <u>Amoco Prod. Co.</u>, 480 U.S. at 542).  The Ninth Circuit recently clarified this position as it relates to the issuance of injunctions to stop military training for the purpose of protecting marine mammals, holding that the district court is "<u>required to consider</u>, not only the balance of hardships as between the plaintiffs and the Navy as an Executive Branch agency, but also the <u>public interest in having a trained and effective Navy</u>."  <u>Winter</u>, 2007 WL 2481465, at *2 (internal quotations omitted and emphasis added).

In the context of NEPA, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action.  <u>Thomas v. Peterson</u>, 753 F.2d 754, 764 (9th Cir. 1985).  While there is no automatic issuance of an injunction for a violation of NEPA, the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction.  <u>High Sierra Hikers Ass'n</u>, 390 F.3d at 642 (quoting <u>American Motorcyclist Ass'n v. Watt</u>, 714 F.2d 962, 965 (9th Cir. 1983)).  "If environmental injury is sufficiently likely, the balance of harms

will usually favor the issuance of an injunction to protect the environment."

Amoco Prod. Co., 480 U.S. at 545.  Furthermore, an "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."  Id.  Thus, where there is a strong claim that NEPA has been violated, and environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment."  Id.

II.  The Administrative Procedure Act Standard

Agency decisions are reviewed under the Administrative Procedure Act ("APA") and may be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  This is a deferential standard and courts must presume that an agency action is valid. Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir. 1992).  The relevant inquiry is whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy, 898 F2d 1410, 1414 (9th Cir. 1990) (citation omitted).

DISCUSSION

I.  Plaintiffs' Motion for Preliminary Injunction

Plaintiffs have asked this Court to issue a preliminary injunction prohibiting the Navy from using MFA sonar during the remaining USWEXs, the next of which is now scheduled for March 2008, based on Defendants' alleged violations of NEPA, the CZMA, and the NMSA.  For reasons set forth in more detail below, the Court finds that Plaintiffs have a high likelihood of success on their NEPA and CZMA claims, but not their NMSA claim.  As recently made clear by the Ninth Circuit in Winter II, however, the Court must be mindful of all established criteria for the issuance of an injunction, namely the possibility of irreparable injury, the balance of hardships, and, importantly here, the clear public interest in matters of national defense.

A.  Probability of Success on the Merits

1.  NEPA

Plaintiffs contend that Defendants violated NEPA by: (1) failing to provide public notice and opportunity to comment on the First EA; (2) preparing substantively flawed and inadequate EAs; and (3) failing to prepare an EIS despite the potential for the challenged exercises to have a significant impact on the environment.

Congress passed NEPA in 1970, declaring "a national policy which will encourage productive and enjoyable harmony between man and his

environment." 42 U.S.C. § 4321. The purpose of NEPA was "to promote efforts which will prevent or eliminate damage to the environment," as well as "to enrich the understanding of the ecological systems and natural resources important to the Nation." Id. NEPA does not contain substantive requirements that dictate a particular result; instead, NEPA is aimed at ensuring agencies make informed decisions and "contemplate the environmental impacts of [their] actions." Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989) (concluding that NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.")

In pursuit of these goals, NEPA mandates that all federal agencies take a "hard look" at the environmental consequences of all proposed "major Federal actions significantly affecting the quality of the human environment" through the preparation of an EIS. 42 U.S.C. § 4332(2)(C). In addition to aiding internal agency decisionmaking, publication of an EIS "also serves a larger informational role. It gives the public the assurance that the agency has indeed

considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment." Robertson, 490 U.S. at 349 (internal quotations and citations omitted).

The Ninth Circuit has interpreted this provision as requiring agencies to prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005). The Council on Environmental Quality ("CEQ") and other federal agencies', including the Navy's, regulations implement NEPA. See, e.g.,40 C.F.R. §§ 1500 et seq.; 32 C.F.R. §§ 775 et seq. Under these regulations, an agency may prepare an EA to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4, 1508.9(b); see also 32 C.F.R. § 775.2(c). The EA must identify all reasonably foreseeable impacts, analyze their significance, and address alternatives. 40 C.F.R. §§ 1508.8, 1508.9, 1508.27. To trigger the requirement for an EIS, a plaintiff need not show that significant effects will in fact occur; raising "substantial questions whether a project may have a significant effect is sufficient." Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998) (internal citation omitted and emphasis added).

If, based on the EA, the agency concludes that the proposed actions

will not significantly affect the environment, it may issue a FONSI and forego

completion of an EIS.  <u>Bob Marshall Alliance v. Hodel</u>, 852 F.2d 1223, 1225 (9th

Cir. 1988); 40 C.F.R. § 1501.4(e).  Agencies must complete an EA and, as

necessary, an EIS before reaching a final decision or making an "irreversible and

irretrievable commitment of the availability of resources."  <u>Envtl. Def. Fund, Inc.

v. Andrus</u>, 596 F.2d 848, 852 (9th Cir. 1979).

a.  <u>Public Notice and Comment</u>

Plaintiffs contend that the Navy violated NEPA by failing to provide

the public with opportunity to provide input while the agency was preparing the

First EA.  Defendants counter that the Navy's circulation of the First EA for public

comment on September 14, 2007, the subsequent analysis of the comments

received as a result of this notice, and the production of the Revised EA satisfied

the public involvement aspect of NEPA.  The Court agrees with Plaintiffs and finds

that they have a high likelihood of success on the merits of this claim.

One of NEPA's fundamental purposes is to "ensure that federal

agencies are informed of environmental consequences <u>before</u> making decisions and

that the information is available to the public."  <u>Citizens for Better Forestry v.  U.S.

Dept. of Agriculture</u>, 341 F.3d 961, 970-71 (9th Cir. 2003) (citing <u>Okanogan

Highlands Alliance v.  Williams</u>, 236 F.3d 468, 473 (9th Cir. 2000) (emphasis

23

added).  "NEPA's public comment procedures are at the heart of the NEPA review process."  California v. Block, 690 F.2d 753, 770 (9th Cir. 1982).  "NEPA procedures must insure that environmental information is available to public officials and citizens before . . . actions are taken," and "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  Regardless of whether they prepare an EA or EIS, federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," and "[s]olicit appropriate information from the public."  40 C.F.R. § 1506.6(a),(d).

        The Ninth Circuit has interpreted NEPA's regulations to mean that the public must be given an opportunity to comment on draft EAs and draft EISs.  Citizens for Better Forestry, 341 F.3d at 970 (quoting Anderson v.  Evans, 314 F.3d 1006, 1016 (9th Cir. 2002)).[9]  While there is no minimum level of public

---

[9]        Other circuit courts are split regarding whether the public must be informed of the preparation of a draft EA.  See, e.g., Greater Yellowstone Coal v. Flowers, 359 F.3d 1257, 1279 (10th Cir. 2004) (not making available the draft EA and other project documents before a decision was made was found not to be arbitrary); Pogliani v. U.S. Army Corps of Eng'rs, 306 F.3d 1235, 1238-39 (2d Cir. 2002) (plaintiffs were unlikely to succeed on their claim that defendant "erred by failing to release its draft EA and FONSI for public comment prior to their issuance"); Alliance to Protect Nantucket Sound v. U.S. Dep't of Army, 398 F.3d 105, 115 (1st Cir. 2005) ("there is no legal requirement that an environmental assessment be circulated publicly and, in fact, they rarely are"); Fund for Animals, Inc. v. Rice, 85 F.3d 535, 549 (11th Cir. 1996) (there is no statutory requirement

comment and participation required, a complete failure to involve or even inform

the public about an agency's preparation of an EA and a FONSI violates NEPA.

Id.  In short, agencies should provide adequate "pre-decisional opportunities for

informed public involvement in the environmental review process."  Sierra Nevada

Forest Prot. Campaign v. Weingardt, 376 F. Supp. 2d 984, 992 (E.D. Cal. 2005).

It is unclear to this Court whether the Navy and Defendants claim that

the First EA was a "draft."[10]  Regardless, the titling of the document is less

important than the procedures and actions that accompanied it.  Here, the Navy

produced, in January of 2007, its First EA and FONSI for the USWEX,

determining that there would be no significant impacts to resources from the

proposed action and, therefore, that preparation of an EIS was not required.  On the

basis of this decision, the Navy proceeded in April 2007 with two of the proposed

twelve USWEXs.  In September 2007, approximately seven months after the

issuance of the First EA and five months after some of the proposed actions had

that an agency provide opportunity for public comment of any particular kind, and
"we are unwilling by judicial decision to legislate such a requirement into
[NEPA]").

[10]     The full title of the First EA is "Undersea Warfare Exercise (USWEX)
Programmatic Environmental Assessment/Overseas Environmental Assessment
(EA/OEA)."  Defendants, in their Supplemental Motion in Opposition to Plaintiffs'
Motion for Preliminary Injunction, refer to the First EA as a "draft" on one
occasion, on page 7.  ("The Navy's circulation of a draft EA . . . ").  The title of the
Revised EA is identical to the First EA.

taken place, the Navy opened the First EA to public comment.  Less than one

month later, the Navy produced the Revised EA and FONSI.  The Revised EA

addressed comments from the public but ultimately came to the same conclusion as

the First EA.

This Court finds the Navy's post hoc attempts to comply with the

public notice and opportunity to comment provisions of NEPA to be inadequate.

The case law and NEPA regulations could not be more clear – the public is to be

involved <u>before</u> the decision to proceed with a project is made and agencies must

diligently strive to involve the public in <u>preparing</u> their NEPA obligations.  40

C.F.R. § 1506.6(a).  Here, the public was informed approximately seven months

<u>after</u> the preparation of the First EA and the issuance of the First FONSI and well

after a significant portion (one-sixth, or two out of a possible twelve) of the

proposed exercises had already occurred.  In other words, as opposed to allowing

the public a pre-decisional opportunity to comment, as NEPA demands, the Navy

instead made an initial determination, began the activity, and then belatedly

decided that it should include the public in its environmental decision making

process.  The Navy's actions adhere neither to the clear language of NEPA's

regulations nor to NEPA's overall purpose and intent.

b.  <u>The Adequacy of the Navy's EAs</u>

26

In their original Injunction Motion, Plaintiffs allege that the Navy's EAs are substantively flawed and inadequate in numerous respects, specifically: (1) the Navy's harm threshold is contrary to the best available information and scientific consensus; (2) the Navy failed to address population-level impacts; (3) the Navy ignored the fact that its sonar will cause PTS-level exposure and possible mortality; (4) the Navy's proposed mitigation offers no meaningful protection and cannot support a FONSI; (5) the Navy failed to adequately examine alternatives; and (6) the Navy's claim that its previous exercises caused no harm is scientifically unsupportable.  Because the Court finds that Plaintiffs have demonstrated a high probability of success on their first and fifth claims relative to the adequacy of the Navy's EAs, the Court will not discuss the remaining claims.

### i.  The Navy's Noise Thresholds

Plaintiffs argue that the Navy relied on NMFS' scientifically unsupported noise thresholds in evaluating effects on marine mammals.  In essence, Plaintiffs claim, the Navy's noise thresholds, under which no "harm" occurs unless sonar levels reach at least 195 dB, are not supported by the best available science.  The Court notes at the outset of this discussion that it is aware that judicial deference to the expert opinion of agencies is usually appropriate.  See Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1301 (9th Cir. 2003)

27

("Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies."). Indeed, this Court is not equipped, nor is it permitted by Ninth Circuit and Supreme Court precedent, to substitute its own judgment for that of an expert agency regarding the appropriateness of the science utilized by the Navy and NMFS here.  Marsh v. Ore. Natural Res. Council, Inc., 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive.").  The Court finds, however, in its careful review of Defendants' Revised EA and Revised FONSI, that the sub-TTS threshold value of 173 dB advocated by NMFS for determining non-behavior altering exposure events is not supported by the best available science under even the most deferential review standard.

The "Behavioral Effects" section in the Revised EA begins with the statement that the Navy proposes a behavioral effects threshold of 190 dB based primarily on published studies by Finneran and Schlundt that were conducted on captive marine mammals.  (Revised EA at 4-15)  After a lengthy discussion of why the  190 dB number is appropriate, the Revised EA changes course, stating that NMFS, based on this "large and growing body of literature" regarding acoustic

effects on wild marine mammals, believes that these animals are affected at "significantly lower levels" than those determined in the two captive animal studies relied upon by the Navy. (Id. at 4-16.)  There follows a brief recitation of this literature.  A group of studies by Malme et al., Ljungblad et al., and Tyack and Clark suggest that cetaceans exposed to human noise sources, such as seismic airgun sounds and low frequency sonar signals, exhibit avoidance behavior when exposed to sounds in the 140 - 160 dB range. (Id.)  A 2004 study by Nowacek et al. and, tellingly, NMFS, (the "Nowacek study") on wild North Atlantic right whales indicated that animals exposed to sounds similar to those used in USWEX[11] showed behavioral effects, including the alteration of feeding, diving, and social behavior, at levels on between 133 - 148 dB.  Finally, the Nowacek study also showed that whales reacted strongly (immediate cessation of foraging behavior and rapid surface ascent) to alert signals received on the order of 160 dB.[12] (Id.)  The Revised EA then briefly outlines the differences between laboratory noise

---

[11]     These sounds included "ship noise, social sounds of con-specifics, and an alerting stimulus (frequency modulated tonal signals between 500 Hz and 4.5 kHz)." (Revised EA, Ex. 13 at 4-16, attached to Pls.' Mot. for Prelim. Inj.)

[12]     The Revised EA includes the following caveat regarding the Nowacek study: "However, the frequencies used, the modulated tones, and the long duration of the alert stimuli are not the same as U.S. Navy mid-frequency sonar and were designed specifically to create a behavioral reaction in North Atlantic right whales." (Id.)

29

exposures and frequency modulation and propagation patterns of tactical sonar in operational environments.  The document concludes with a brief discussion of the "considerable uncertainty" regarding the validity of applying data collected from trained, captive animals conditioned to not respond to noise exposure in setting thresholds for behavioral reactions of wild mammals.  (Id.)

Given these considerations, NMFS postulates that a "more conservative acoustic behavioral disturbance threshold for sub-TTS behavioral disturbance than the 190 dB . . . criterion is necessary." (Id.)  Acknowledging the limitations of field observations in the wild and the advantages of the captive studies, the Revised EA then states that NMFS prefers a sub-TTS threshold of 173 dB.  (Id.)   Defendants claim, in their Response to Court's Questions from Preliminary Injunction Hearing ("Response") (Doc. # 89), that the 173 dB figure is based upon the Finneran and Schlundt study, the Nowacek study, and the NMFS Haro Strait report.  Defendants, however, contradict their own argument, admitting later in the Response that the 173 dB number is based entirely on the Finneran and Schlundt captive animal study, which determined that 173 dB is the level at which 25% of the exposures would cause the most sensitive marine mammals to exhibit some behavioral reaction in response to one of the exposed frequencies.  Despite their assertions to the contrary, Defendants did not directly incorporate any

information from studies besides Finneran and Schlundt.

On the other hand, Plaintiffs have produced extensive and compelling evidence that the 173 dB delineation does not accurately reflect the level at which negative behavioral responses in marine mammals may occur.  (See, e.g., Decl. of David Bain ("Bain Decl."), Ex. 18 at 5, attached to Pls.' Mot. for Prelim. Inj. (claiming that killer whales are known to experience changes in swimming velocity and behavioral states at sound pressures lower than 110 dB); Decl. of Robin Baird ("Baird Decl."), Ex. 19 at 6, attached to Pls.' Mot. for Prelim. Inj. (claiming that killer whales exposed to MFA sonar displayed unusual diving patterns, ceased feeding, and fled the ensonified area at received levels near 150 dB; Decl. of Edward Parsons ("Parsons Decl."), Ex. 22 at 5, attached to Pls.' Mot. for Prelim. Inj. (citing Nowacek to establish that there is a strong behavioral response in marine mammals to energy levels of 153 dB).

Defendants, however, base the 173 dB threshold on a single study of captive, trained animals – a study that has been vigorously attacked not only by a litany of experts in the field, but by NMFS itself.  In the Revised EA, the Navy acknowledges that, "NMFS believes that the large and growing body of literature regarding the reactions of wild, naïve marine mammals to anthropogenic exposure generally suggests that wild animals are behaviorally affected at significantly lower

31

levels than those determined for captive animals by Finneran and Schlundt

(2004)." (Revised EA at 4-16.) The Court is unclear how the Navy can claim it

relied upon the best available science when its own EA indicates that NMFS

believes that it did no such thing.

While this Court acknowledges the nascent nature of this issue and the

science surrounding it, it is unconvinced that NMFS and the Navy's approach

toward setting the behavioral harm threshold is justified. Defendants have simply

not articulated a rational connection between what the vast majority of published,

peer reviewed science indicates and the 173 dB threshold. This casts into serious

doubt the Navy's assertion that, despite over 60,000 potential exposures to MFA

sonar, marine mammals will not be jeopardized. In light of this discussion, the

Court finds Defendants' reliance on the sub-TTS threshold of 173 dB to be

arbitrary and capricious. Accordingly, Plaintiffs are likely to succeed on this

claim.

### ii.  Alternatives Analysis

NEPA requires agencies to "study, develop, and describe appropriate

alternatives to recommended courses of action in any proposal." 42 U.S.C.

§ 4332(E); see also 40 C.F.R. § 1508.9(b) (EAs "[s]hall include brief discussions .

. . of alternatives"). The Ninth Circuit has held that:

> consideration of alternatives is critical to the goals of
> NEPA even where a proposed action does not trigger the
> EIS process.  This is reflected in the structure of the
> statute: while an EIS must also include alternatives to the
> proposed action, 42 U.S.C. § 4332(2)(C)(iii) (1982), the
> consideration of alternatives requirement is contained in
> a separate subsection of the statute and therefore
> constitutes an independent requirement.  See id.
> § 4332(2)(E).  The language and effect of the two
> subsections also indicate that the consideration of
> alternatives requirement is of wider scope than the EIS
> requirement.

Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228-29 (9th Cir. 1988).

Informed and meaningful consideration of all alternatives – including the no-action

alternative – is an integral part of the NEPA statutory scheme.  Alaska Wilderness

Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723, 729 (9th Cir. 1995)

(internal citation omitted).  Where the agency considers only a no-action

alternative along with two "virtually identical alternatives," NEPA is violated.

Muckle shoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 813 (9th Cir.

1999).

This Court recognizes that Hawai`I's waters provide a unique training

opportunity for deploying strike groups.  However, this does not give the Navy

unmitigated leeway to tailor its environmental analysis so narrowly as to preclude

anything but its desired result.  Here, the Navy considered, in both its First and

Revised EAs, the following alternatives: (1) Alternative 1 – six USWEXs per year;

33

(2) Alternative 2 - four USWEXs per year; and (3) the No-Action Alternative.
(Revised EA at 2-11– 2-12.)  Alternative 1 is designed to meet the "maximum
expected U.S. Navy and Department of Defense current and near-term operational
training requirements based on known and expected force structure." (Id. at 2-11)
Alternative 2 is designed to meet the "typical" expected training requirements. (Id.
at 2-12)  Under the No-Action Alternative, individual training exercises
comprising a USWEX would continue to occur but they would not be consolidated
into a coordinated training event. (Id.)  Instead, these exercises would be
environmentally analyzed individually, with the events occurring on an as-needed
basis. (Id.)  Consolidating training events into a USWEX, as the proposed action
does, "would result in more realistic combat conditions with the ability to assess
submarine warfare training postures in the Hawaiian Islands Operating Area prior
to deployment." (Id.)

        In essence, the Navy's alternatives analysis consists of a preferred
option, which allows them to undertake the maximum level of USWEXs to meet
their operational objectives, a second option, which mirrors the first option except
that it decreases the amount of USWEXs by four (or one-third of the proposed total
in Alternative 1), and a third option, which allows them to conduct the same
exercises, just not consolidated into a single USWEX, and which is summarily

34

dismissed as fundamentally inconsistent with naval training objectives.  Moreover, the No Action Alternative is a true "no action" alternative in name only; in reality, this option would allow the Navy, though not in the manner required by its training needs, to engage in exercises using MFA sonar at much the same level and frequency as the preferred alternatives.

This alternatives analysis essentially relegates environmental considerations to secondary status and, thus, runs contrary to the goal of NEPA. "The goal of the statute is to ensure that federal agencies infuse in project planning a thorough consideration of environmental values.  The consideration of alternatives requirement furthers that goal by guaranteeing that agency decision makers have before them and take into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance . . . ."  Bob Marshall Alliance, 852 F.2d at 1228 (internal citations omitted) (emphasis in original).  The kind of thorough consideration of environmental values called for by NEPA is not possible when the end result – engaging in military exercises using devices that are potentially harmful to the environment – is predetermined.  The Court also fails to see how a "no action" alternative that involves the continuation of individual training exercises using MFA sonar subject to the Navy's discretionary

35

environmental review falls within NEPA's explicit alternatives analysis requirement.

The Navy's alternatives analysis fails to meet NEPA's standards and, as a result, Plaintiffs have a high likelihood of success on this claim.

### c. The Navy's Obligation to Prepare an EIS

The Plaintiffs, in demonstrating that the EAs were deficient, show a probability of success on their claim that the Navy is obligated to prepare an EIS for USWEX.  As previously discussed, the Ninth Circuit has interpreted the NEPA provision mandating the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment, 42 U.S.C. § 43322(C), to require agencies to prepare an EIS "where there are substantial questions about whether a project <u>may</u> cause significant degradation of the human environment."  <u>Native Ecosystems</u>, 428 F.3d at 1239 (emphasis in original).  To trigger the requirement for an EIS, a plaintiff need not show that significant effects will in fact occur, raising "substantial questions whether a project may have a significant effect is sufficient."  <u>Idaho Sporting Cong.</u>, 137 F.3d at 1150.

Notwithstanding the procedural and technical defects with the Navy's environmental assessment here, Plaintiffs have raised substantial questions as to whether USWEX would have a significant impact on the environment.  Mass

strandings of several species of whales following naval exercises have been

documented in the Bahamas, the Canary Islands, Hawai`I, North Carolina, Japan,

Greece, Spain, Taiwan, the Madeira archipelago, and the U.S. Virgin Islands.  (See

generally, Exs. 7-17, attached to Pls.' Mot. for Prelim. Inj.)  The International

Whaling Commission's Scientific Committee concluded that "[t]he weight of

accumulated evidence now associates mid-frequency, military sonar with atypical

beaked whale mass strandings. (8/21/07 Report of the Standing Working Group on

Environmental Concerns, Ex. 9 at 9, attached to Pls.' Mot. for Prelim. Inj.)  This

evidence is convincing.  A Navy-sponsored study similarly concluded, "the

evidence of sonar causation is, in our opinion, completely convincing and that

therefore there is a serious issue of how best to avoid/minimize future beaching

events."  (Active Sonar Waveform, Ex. 10 at 1, attached to Pls.' Mot. for Prelim.

Inj.)

            In addition to stranding events, MFA sonar has been linked to

embolisms found in dead whales' organs, with experts believing that loud sonar

causes deep-diving whales to ascend rapidly and suffer corresponding

decompression sickness.  (5/25/07 Report of the Standing Working Group on

Environmental Concerns, Ex. 12 at 33, 39, attached to Pls.' Mot. for Prelim. Inj.)

NMFS' own BiOps (both the First and Revised) rely on studies that conclude that

37

sonar may disrupt behavior, causing whales to change diving patterns and

migration routes and to cease foraging, feeding and communicating.  (Revised

BiOp at 4-15 – 4-16)

Based on the Navy's less than adequate analysis of alternatives and

reliance on an arbitrary sub-TTS harm threshold, in addition to the volume and

persuasiveness of information presented by Plaintiffs showing a likelihood of

physical and behavioral effects on marine mammals, this Court finds that the Navy

must prepare an EIS for USWEX.  The Court notes that the Navy is in fact

currently preparing the Hawai'i Range Complex EIS ("HRC EIS"), which will

include the remaining USWEXs scheduled through January 2009.[13]  (Defs.' Supp.

Opp. to Pls.' Mot. for Prelim. Inj. at 3; see also Revised EA at 4-12.)  The HRC

EIS is expected to be released in June 2008.  (Defs.' Supp. Opp. to Pls.' Mot. for

Prelim. Inj. at 12.)  It appears that the Navy and NMFS will be revising the

modeling methodology for assessing the probability of marine mammals being

behaviorally harassed by potential exposure to MFA sonar for purposes of the

---

[13]      The fact that the Navy is currently preparing the HRC EIS cuts against
Defendants' argument that an EIS is not required for USWEX.  It strains credulity
to argue that an EIS is not required on the one hand for the 2007 and 2008
USWEXs while, on the other hand, an EIS is in the process of being prepared that
will encompass the 2009 USWEXs and subsequent exercises.  Clearly, if an EIS is
justified in one circumstance, it is justified in the other as well.

HRC EIS.[14]

Plaintiffs make several additional arguments in support of their claim that an EIS is required in their Supplemental Brief Regarding Defendants' NEPA Violations, namely that: (1) USWEX will occur in ecologically critical areas; (2) the effects of USWEX are highly controversial; (3) USWEX's possible impacts are highly uncertain and involve unique risks; (4) the proposed action violates several other laws, and also threatens endangered species, triggering the need for an EIS, and (5) USWEX have potentially significant cumulative effects that the EAs ignore. The Court, for the reasons set forth in brief below, finds the first, second, and third of these arguments compelling. They buttress the Court's previous finding that an EIS should be completed for USWEX.

As previously discussed, NEPA requires the preparation of an EIS wherever the impact to the environment may be "significant." Nat'l Parks & Conservation Ass'n v. Babbit, 241 F.3d 722, 730 (9th Cir. 2001). NEPA's regulations provide guidance on whether effects of an action may be significant. For example, where the unique characteristics of the geographic area in which the proposed activity is to occur involves proximity to ecologically critical areas, the

_____

[14]     From the current "energy flux density methodology" to a "dose function modeling methodology." (Revised EA, Ex. 13 at 4-12, attached to Pls.' Mot. for Prelim. Inj.)

impact of the action may be considered significant.  40 C.F.R. § 1508.27(b)(3).

Here, Plaintiffs argue that USWEX will occur in proximity to the Hawaiian Islands

Humpback Whale National Marine Sanctuary ("HIHWNMS") during a portion of

the year when thousands of endangered humpback whales inhabit the shallow

waters around Hawai`I and in proximity near seamounts where deep-diving beaked

whales are known to congregate.  As both of these locations are ecologically

sensitive areas, the argument goes, USWEX's impacts are significant for NEPA

purposes.  Defendants counter that the Navy is permitted to conduct

exercises in the HIHWNMS and its exercises have not resulted in documented

harm to marine mammals over the past 40 years.

The Court agrees with Plaintiffs.  Regardless of whether the Navy is

permitted to perform its exercises in the HIHWNMS, which will be discussed more

in the NMSA section below, it is at least arguable that a federally-recognized

sanctuary constitutes an ecologically critical area for purposes of NEPA.[15]

Accordingly, Plaintiffs' contention that an EIS is warranted based on USWEX's

proximity to the HIHWNMS has merit.

---

[15] This is especially so when viewed in light of the purpose behind the HIHWNMS, which is to preserve and protect humpback whales and their habitat. Oceans Act of 1992, Pub. L. No. 102-587 §§ 2301-07, 106 Stat. 5039, 5055-59; 15 C.F.R. §§ 922.180 - 922.187.

Plaintiffs' next argument – that an EIS is required because the effects of USWEX are extremely controversial – is similarly compelling.  An action may be deemed significant under NEPA when the degree to which the effects on the quality of the environment are likely to be highly controversial.  40 C.F.R. § 1508.27(b)(4).  Plaintiffs argue that, when declarations of conservationists, biologists, and other experts are highly critical of an EA and dispute the agency's conclusion that there would be no significant effects from the proposal, this is "precisely the type of 'controversial' action for which an EIS must be prepared." Sierra Club v. U.S. Forest Serv., 843 F.2d 1190, 1193 (9th Cir. 1988).  Defendants claim that the preparation of an EIS is mandated only where uncertainty may be resolved by further collection of data, or where the collection of data may prevent speculation on potential effects.  See Native Ecosystems, 428 F.3d at 1240 (citation omitted).

Agencies must prepare environmental impact statements whenever a federal action is "controversial," that is, when "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor," Northwest Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1539 (9th Cir. 1997) (quoting LaFlamme v. FERC, 852 F.2d 389, 397 (9th Cir. 1988)) (Reinhardt, J., concurring in part and dissenting in part), or

41

there is "a substantial dispute [about] the size, nature, or effect of the major Federal action." Blue Mountains, 161 F.3d at 1212 (citing Greenpeace Action, 14 F.3d at 1335; Sierra Club, 843 F.2d at 1190).   A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of an agency's conclusions.   Nat'l Parks & Conservation Ass'n, 241 F.3d at 736 (internal citations omitted).   NEPA then places the burden on the agency to come forward with a well-reasoned explanation demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences.   Id.   The term "well reasoned explanation" is simply a less direct way of saying that the explanation must be "convincing."   Id.

The Court finds that a substantial controversy exists with regard to the Navy's environmental impacts analysis for USWEX.   While the Court does not recount Plaintiffs' numerous experts or their findings in detail here, it is accurate to say that the evidence disputing the Navy's environmental conclusions is substantial.   NMFS itself admitted, in its official report on the 2004 Hanalei whale incident, that: "[f]or the past decade, the potential role of acoustic exposure, particularly to tactical mid-frequency, military active sonar, in marine mammal stranding events has been a subject of relatively intense consideration and debate."

(Hanalei Report, Ex. 8 at 33, attached to Pls.' Mot. for Prelim. Inj.)  Moreover, Defendants have not come forward with a sufficiently convincing explanation why the evidence before this Court, which is subject to substantial media attention, does not create a public controversy.  Instead, Defendants assert that Plaintiffs simply disagree with the Navy's analysis, which it alleges is consistent with consensus views of the scientific community.  This is not only inaccurate, in light of the substantial amount of conflicting information before the Court, but, even if true, would not rise to the level of "convincing" for purposes of satisfying Defendants' burden here.  There is substantial national controversy regarding the Navy's use of MFA sonar and this fact further supports the need for an EIS.

Finally, Plaintiffs claim that an EIS is required because USWEX might have uncertain impacts or involve unique risks.  An action may be deemed significant under NEPA where possible effects on the environment are uncertain or involve unique or unknown risks.  40 C.F.R. § 1508.27(b)(5).  If ever a factual scenario satisfied this criteria, it is this one.  The uncertainty of the effects of MFA sonar on marine mammals – at what levels, at what distances, under what conditions, and on which species  – is at the heart of this lawsuit and the voluminous briefings, declarations, and rival studies only underscore this point.  Defendants admit, with respect to the 2000 Bahamas stranding, that "the specific

43

mechanisms that led to the Bahamas stranding are not understood and there is

uncertainty regarding the ordering of effects that led to the stranding."  (Revised

EA at 4-18.)  This statement encapsulates the issue and underscores the necessity

for an EIS.

For the reasons discussed above, Plaintiffs have demonstrated a

probability of success on their NEPA claims.

## 2.  CZMA

Plaintiffs' third cause of action alleges that Defendants violated the

CZMA by ignoring the law's mandatory procedural requirements.  The CZMA

requires that "[e]ach federal agency activity within or outside the coastal zone that

affects any land or water use or natural resource of the coastal zone shall be carried

out in a manner which is consistent to the maximum extent practicable with the

enforceable policies of approved state management programs." 16 U.S.C. §

1456(c)(1).  Under the CZMA, agencies must comply with "the enforceable

policies of management programs unless full consistency is prohibited by existing

law applicable to the Federal agency."  15 C.F.R. § 930.32(a)(1).  Agencies must

submit a consistency determination "for all Federal agency activities affecting any

coastal use or resource" to the applicable state agency.  15 C.F.R. § 930.34.

Effects on coastal resources is construed broadly: "[t]he term . . . means any

<u>reasonably foreseeable</u> effect on any coastal use or resource resulting from a

Federal agency activity[.]"  15 C.F.R. § 930.11 (emphasis added).  If the agency

determines that there will be no effects, the agency shall submit a negative

determination describing the activity and explaining why it will have no reasonably

foreseeable effects on coastal uses or resources.  15 C.F.R. § 930.35.  Although the

CZMA lacks a citizen suit provision, judicial review of agency compliance is

available pursuant to the APA.  <u>See</u>, <u>e.g., Friends of Earth v. U.S. Navy</u>, 841 F.2d

927, 936 (9th Cir. 1988); 5 U.S.C. §§ 701-06.  Thus, the Navy's action with regard

to the CZMA may be set aside only if it is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  5 U.S.C.

§ 706(2)(A); <u>Anaheim Memorial Hosp. v. Shalala</u>, 130 F.3d 845, 849 (9th Cir.

1997).

 Before determining whether the Navy violated the CZMA, the Court

first briefly reviews the actions the Navy took pursuant to its obligations under the

CZMA.  As stated previously, following the issuance of the First EA and FONSI,

the Navy conducted two USWEXs in April 2007.  Plaintiffs filed the instant suit in

May 2007.  On August 14, 2007, the Navy then submitted a programmatic

Negative Determination ("First ND") for all of its proposed USWEXs finding that

the exercises would not have reasonably foreseeable direct or indirect effects on

any coastal use or resource of the State's coastal zone.  (First ND, Ex. 3 at 2,

attached to Def.'s Mot. in Opp'n to Pls.' Inj. Mot.)  On October 5, 2007, the State

objected to this determination, finding that USWEX would have reasonably

foreseeable affects on coastal resources and uses and, as a result, a consistency

determination was required.  (10/5/07 Letter from Acting Director Mary Lou

Kobayashi, Ex. 16, attached to Def.'s Supp. Opp'n to Pls.' Inj. Mot.)

         Representatives of the State and the Navy met on numerous occasions

to discuss the issues set forth in the State's objection to the Navy's First ND.  On

October 25, 2007, the Navy submitted another Negative Determination ("Second

ND") limited to the November 2007 USWEX based on the fact that the MFA sonar

portion of these exercises would occur approximately 20 nautical miles ("nm") or

greater from shore.  On October 29, 2007, the State agreed to the Navy's Second

ND pursuant to ten conditions, one of which was that a single comprehensive

consistency determination would be submitted for all remaining USWEXs.

(10/29/07 Letter from Acting Director Mary Lou Kobayashi, Ex. 18, attached to

Def.'s Supp. Opp'n to Pls.' Inj. Mot.)

         On February 4, 2008, the Navy submitted a Negative Determination

("Third ND") for its March 2008 USWEX, asserting that all planned exercises

would occur approximately 40 nm or greater from shore.  (Third ND, Ex. 34,

attached to Def.'s Second Supp. Opp'n.)  Thus, the Navy requested the State's concurrence with its determination that no reasonably foreseeable effects on coastal uses or resources would occur as a result of the March 2008 USWEX. (Id.)[16]

The Navy failed to adhere to the CZMA in two respects.  First, it submitted its First ND well after the CZMA proscribed deadline. CZMA regulations mandate that a negative determination, where appropriate, must be provided to the state agency "at least 90 days before final approval of the activity" under the CZMA.  15 C.F.R. § 930.35.  As already documented, the Navy completed its First EA and issued its First FONSI in January/February 2007 and conducted the first two USWEXs in April 2007.  The Navy submitted its First ND to the State on August 14, 2007.  Whether the issuance of the FONSI or the onset of the exercises themselves is considered the "final approval of the activity," both occurred prior to the submission of the First ND.  CZMA regulations clearly provide for the opposite – the First ND was supposed to have been submitted 90 days before final approval of the activity.  The Navy's actions were therefore not in accordance with the procedural requirements of the CZMA.

---

[16]     The record does not reflect, nor do the parties comment on, the State's response to the Third ND.

Second, the three NDs principally rely on the results of the Revised EA and Revised BiOp for the proposition that USWEX would not have reasonably foreseeable effects on any coastal use or resource.  For the reasons set forth in Part I.A.1 above, the Navy did not comply, either procedurally or substantively, with the requirements of NEPA in reaching its "no significant impact" determination. Notwithstanding the different legal requirements under the CZMA and NEPA, Defendants' reliance on its flawed NEPA analysis for its NDs render its determinations pursuant to the CZMA arbitrary and capricious.  In short, the Navy could not have accurately determined that there would be no reasonably foreseeable effects on coastal uses or resources if the information it relied on to make this determination was insufficient.

For these reasons, Plaintiffs have demonstrated a probability of success on their CZMA claims.

### 3. NMSA

In their third claim, Plaintiffs allege that the Navy must adhere to the NMSA's consultation provision because the HIHWNMS EIS ("Sanctuary EIS") does not disclose the use of MFA sonar within the EIS.  Plaintiffs have not demonstrated a probability of success on this claim.

Congress designated the HIHWNMS in 1992 to protect and preserve

48

humpback whales and their habitat.  Oceans Act of 1992, Pub. L. No. 102-587 §§ 2301-07, 106 Stat. 5039, 5055-59; 15 C.F.R. §§ 922.180 - 922.187.  If federal agency actions within or outside of the HIHWNMS are likely to injure a sanctuary resource, the agency must consult with the Secretary of Commerce at least 45 days before approving a final action.  16 U.S.C. § 1434(d)(1)(A)-(B).  If the Secretary determines that the proposed action is likely to have such effects then the Secretary must "recommend reasonable and prudent alternatives[.]" Id. § 1434(d)(2).  Activities that are allowed within the HIHWNMS include "all classes of military activities, internal or external to the Sanctuary that are being or have been conducted before the effective date of these regulations [November 29, 1999], as identified in the Final Environmental Impact Statement/Management Plan."  15 C.F.R. § 922.183(b).  Consultation is not required for ongoing or previously conducted military activities in the HIHWNMS.  Id.

Plaintiffs allege that the Navy did not disclose the use of MFA sonar in the Sanctuary EIS and, thus, USWEX is not exempt from consultation.  Because the Sanctuary EIS discusses low power sonar only, Plaintiffs contend, the Navy's contention that it does not have to consult is meritless.  Defendants counter that the Sanctuary EIS contains numerous references to anti-submarine and other warfare exercises involving sonar and USWEX is therefore excluded from the consultation

obligation.

Based on the information it has available to it at this time, the Court finds Defendants' argument more persuasive.  First, the Sanctuary EIS does not distinguish between different types of sonar.  (Sanctuary EIS, Ex. 8 at 387-88, attached to Defs.' Mot. in Opp'n. ("Anti-submarine warfare(ASW) operations involving the use of sonar[.]"; "Mine warfare and mine counter-measure (MCM) operations involving the use of sonar[.]"; "Anti-submarine warfare operations involving the use of sonar[.]"; "Shallow water ASW and anti-ship operations, which include the expenditure of non-recoverable sonobuoys[.]"; "ASW target services for ships and aircraft, which include the expenditure of non-recoverable sonobuoys and smoke markers and use of sonar[.]")) Furthermore, the Revised EA states that "[t]he use of mid-frequency active tactical sonar in ASW training has been occurring in the Hawaiian Islands for approximately 40 years using the same basic equipment[.]" (Revised EA at 2-3.)  Based on these examples, it appears that MFA sonar was being used, and was properly referenced, during the consultation process that preceded the issuance of the Sanctuary EIS.[17]  As such, Plaintiffs are not likely to succeed on their NMSA claim.

_____

[17]    The Court notes, however, that it only has before it a sampling of pages from the Sanctuary EIS.

B. <u>Possibility of Irreparable Harm</u>

Where plaintiffs demonstrate a strong likelihood of prevailing on the merits of their claims, injunctive relief is appropriate only where there is a "possibility of irreparable harm." <u>Faith Ctr. Church Evangelistic Ministries v. Glover</u>, 480 F.3d 891, 906 (9th Cir. 2007); <u>Earth Island Inst.</u>, 442 F.3d at 1159. Environmental injury, by its nature, can seldom be remedied by damages and is often permanent or of long duration, i.e., irreparable. <u>Amoco Prod. Co.</u>, 480 U.S. at 545. If such injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. <u>Id.</u>

Plaintiffs have demonstrated that environmental injury is not only likely, but probable, should the Navy be allowed to continue USWEX in reliance upon its flawed environmental analysis. Plaintiffs have shown that MFA sonar can injure and even kill marine mammals and that USWEX is likely to have such effects, possibly to a far greater degree than Defendants' EAs and BiOps acknowledge. The Court finds the Plaintiffs' scientific evidence more credible than that put forth by the Navy, specifically with regard to the effects of MFA sonar on marine mammals. (<u>See</u>, <u>e.g.</u>, Bain Decl.; Baird Decl.; & Parsons Decl; <u>see</u> <u>also</u> Exs. 7-17, attached to Pls.' Mot. for Prelim. Inj.)

Plaintiffs have shown a strong possibility that environmental harm

51

will result should USWEX be allowed to continue while premised upon its current environmental analysis.  In conjunction with this Court's finding that Plaintiffs are likely to succeed on the merits of their NEPA and CZMA claims, appropriately mitigated injunctive relief is warranted here.

III.  Additional Considerations Relevant to an Injunction

The determination that an injunction should issue, however, does not end the discussion.  As the Winter II case makes clear, this Court must consider both the balance of the hardships between the parties as well as the public interest in formulating the specifics of its equitable relief.  In other words, this Court must carefully account for the best interests of not only Plaintiffs and the Navy, but also the public as a whole in crafting a narrowly tailored injunction that protects marine mammals while also allowing critical military training to continue.

A.  Balancing of the Hardships

This Court is obligated to consider the balance of the hardships on the parties.  NRDC v. Winter, No. 07-56157, – F.3d –, 2007 WL 2481465 (9th Cir. August 31, 2007); Southwest Voter Registration Educ. Proj. v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003).  Such an analysis, however, is complicated by the unique facts of this case.  Unlike some cases where the threat of harm is distinguishable from potential hardships to the parties, such is not the situation here.  The Court

52

has already discussed what harm will come to the interests represented by

Plaintiffs, i.e. marine mammals and Hawai`i's ocean environment, should no

injunction issue in the section I.B above.  Correspondingly, while the Court has

already determined that some form of injunctive relief will issue here, the nature

and scope of that relief depends, at least in part, upon an analysis of what harm

would come to the Navy and the defense interests of the United States should this

Court issue an injunction that completely or severely limits the Navy's ability to

conduct USWEX.

The hardship on the Navy in such a scenario would be severe.

Training in the use of MFA sonar is a vital component of USWEX. (Unclassified

Yoshihara Decl. ¶¶ 12-13, 17, 20, attached to Defs.' Mot. in Opp.'n.)[18]  USWEX

provides the Navy with the opportunity to assess ASW capabilities of strike groups

using the potential threats and capabilities they may face.  (Id. ¶ 17.)  Live training

exercises in the Hawai`i range while strike groups are in transit to the Western

Pacific is "necessary to replicate the conditions in many overseas areas in which

U.S. Navy forces could operate in harm's way.  (Id. ¶ 21 (noting that the HRC

---

[18]      The Court notes that, in addition to publicly available information,
this Court has reviewed classified documents.  These documents convince this
Court of the clear and present danger posed to the United States by quiet diesel
submarines now operated by several countries.

provides the most realistic opposition force and offers features found in operating environments in the world's "hot spots").)

In addition, the use of MFA sonar is complex and requires constant training in realistic scenarios to maintain. (Id. ¶¶ 12-16, 20.) MFA sonar is the Navy's primary active sonar system for conducting critical ASW, which allows the Navy to track and potentially engage diesel-electric submarines from potentially hostile nations such as China, North Korea, and Iran. (Id. ¶¶ 6-8, 10-11.) One of the potential targets for these hostile submarines is the Navy aircraft carrier, whose strike group consists of over 6,000 servicemen and women. (Id. ¶¶ 11, 18.) Thus, the inability of a carrier strike group to train using MFA sonar may put thousands of American lives at risk. (Id. ¶¶ 20, 24.)

A blanket injunction preventing further USWEXs would deprive deploying strike groups of the last and best opportunity to hone perishable ASW skills prior to entering areas of the world where they might need them the most. (Id. ¶ 22.) Moreover, delaying a USWEX could result in strike groups being deployed in to real-world theaters of operation, without the ability to conduct ASW at a sufficient level, thus creating a potentially dangerous, even deadly, situation. (Id. ¶ 23.) This Court agrees with Defendants that the Navy's use of MFA sonar is critical to national security and the inability to train using MFA sonar would

present a risk to the Navy's ability to defend itself and the interests of the American people.  (Id. ¶ ¶ 20, 24.)

As the above discussion indicates, the nature of the hardships faced by Plaintiffs and Defendants vary markedly.  Whereas irreparable harm to the environment may result if USWEX is allowed to proceed in its current form, the preparedness of the Navy in tending to its defense obligations would clearly suffer great harm if USWEX was curtailed in a way that would prevent effective training. These hardships are so significant and so potentially severe, yet so different in scope and consequences, that this Court finds the balance of hardships does not tip sharply in favor of either party.  In considering all of the evidence before it, however, the Court finds the threat of irreparable harm to the environment sufficiently compelling to determine that the balance of hardships slightly favors the Plaintiffs here.  The Court will account for the potential hardships to both parties when crafting its narrowly tailored injunction.

B.  Advancement of the Public Interest

The Court is similarly obligated to consider the public interest prior to issuing an injunction.  NRDC v. Winter, No. 07-56157, – F.3d –, 2007 WL 2481465; Shelley, 344 F.3d at 918.  The public interest lies on both sides of this dispute.  On the one hand, the public clearly has an overriding interest in a well-

trained Navy and a secure country.  Makua v. Rumsfeld, 163 F. Supp. 2d 1202, 1222 (D. Haw. 2001) ("the public has a substantial interest in the national well-being and security of the nation.").  On the other hand, "the public also has a significant interest in the protection of endangered species, cultural resources, Native Hawaiian rights, and the environment . . . ."  Id.

This Court has profound respect for Hawai'i's unique environmental and marine resources.  In the past, this Court has ruled against the government, enjoining it from moving forward with projects, and in favor of Hawaiian and environmental groups because the evidence supported such a holding.  In this Court's view, however, there are few things more important than the lives of the men and women who serve in the armed forces and the overall security of our nation.

Based on its review of both unclassified and classified materials submitted by Defendants, this Court is convinced that a wholesale cessation, or a drastic impingement, of the Navy's ability to train via USWEX is contrary to the public interest.  The fact remains that we are currently at war on two fronts and this Court will not compromise our nation's ability to fight and defend itself.  Furthermore, it is within the bounds of reason to assume that other rogue nations, such as North Korea and Iran, that have shown both hostility and contempt for the

56

United States, may attempt to exploit any perceived weakness in this country's defenses.  In short, a poorly trained Navy in an increasingly hostile and unpredictable global environment is a recipe for national disaster.  This Court finds that the public interest necessitates allowing the Navy not only to continue with USWEX, but to do so in a way that will not compromise its overall training objectives or the safety of its personnel.

C.  Review of Mitigation Measures

In order to craft an injunction that both minimizes harm to marine mammals and to the Navy's training requirements, the Court finds that a thorough review of mitigation measures is appropriate here.  The Court will therefore examine: (1) mitigation measures recommended by NMFS for RIMPAC 2006; (2) mitigation measures adopted as part of first National Defense Exemption ("NDE I") issued for MFA sonar exercises pursuant to the MMPA; (3) mitigation measures adopted by the second National Defense Exemption ("NDE II"); (4) the mitigation measures imposed by the Winter II court; (5) Plaintiffs proposed mitigation measures in the instant matter; and (6) Defendants' position relative to the Winter II injunction and the measures proposed by Plaintiffs.

1.  NMFS' Proposed Mitigation for RIMPAC 2006

In March 2006, the Navy applied to NMFS for an incidental

harassment authorization under the MMPA for the RIMPAC 2006 exercises to occur in the Hawai`i Operations Range.  NMFS rejected the Navy's assessment of the risks, stating that "[t]he Navy's analysis of the RIMPAC exercises concluded that no mortality or serious injuries would result from the proposed activities. However, NMFS believes that some marine mammals may react to mid-frequency sonar at received levels lower than those thought to cause direct physical harm, with behaviors that may lead to physiological harm, stranding, or, potentially, death."  71 Fed. Reg. 20986, 20996 (April 24, 2006).  Therefore, NMFS required mitigation measures above and beyond those that the Navy had originally proposed "to ensure that mortality or serious injury leading to mortality does not result from the proposed activity."  Id.  These measures included the following:

(1) Reducing sonar transmission levels by at least 6 dB when marine mammals are detected within 1,000 meters of the transmitting vessel;

(2) Reducing levels by at least 10 dB should a marine mammal be detected within 500 meters of the vessel;

(3) Ceasing transmissions should the marine mammal be detected within 200 meters of the vessel;

(4) In strong surface ducting conditions, enlarging the safety zones such that a 6 dB power-down would occur if a marine mammal entered within 2,000 meters

58

of the source, a 10 dB power-down if within 1,000 meters, and shut-down when an animal closes within 500 meters;

(5) In low visibility conditions, i.e. nighttime, high seas, or other factors limiting visual monitoring capabilities, using additional detection measures, such as infrared or enhanced passive acoustic detection, and powering down sonar as if marine mammals were present in the zones monitors could not see;

(6) Banning all use of MFA sonar within 25 kilometers (13.5 nm) of the 200 meter isobath around the islands;

(7) With the exception of three specified choke point exercises, prohibiting sonar activities in constricted channels or canyon-like areas.  To mitigate the exercises occurring in choke points, NMFS required additional mitigation and monitoring including: (a) at least one dedicated, trained Navy observer and two experienced non-Navy marine mammal observers on Navy ships; (b) monitoring before, during, and after each exercise; (c) experienced cetacean researchers to conduct systematic aerial reconnaissance surveys and observations before, during, and after the choke point exercises; and (d) shoreline reconnaissance and nearshore observations by teams of observers in an around the channels.  Id. at 20998-20999.

2. NDE I

NMFS issued the Navy an incidental take authorization under the

59

MMPA pursuant to the above conditions.  NRDC v. Winter, CV 06-4131 FMC (C.D. Cal. 2006) ("Winter I," as discussed above) was then filed, alleging violation of environmental laws in connection with RIMPAC 2006.  On June 30, 2006, the Secretary of Defense, pursuant to 16 U.S.C. § 1371(f) allowing national defense exemptions, exempted for six months all of the Navy's sonar training from the requirements of the MMPA, subject to a list of mitigation measures, and also explicitly exempted RIMPAC 2006 subject to a similar list of measures.  While the general measures and those specific to RIMPAC 2006 differed in some respects, they mostly paralleled those that NMFS had required in its incidental harassment authorization discussed above.  (See generally, Achitoff Decl., Exs. 1 & 2, attached to Pls.' Mitigation Brief.)

On July 3, 2006, the district court in Winter I temporarily enjoined the Navy's use of sonar in RIMPAC 2006 finding, among other things, that an EIS was required because the NDE I measures were inadequate to eliminate environmental impacts.  The Navy then agreed to implement additional mitigation measures for RIMPAC 2006, including enhanced monitoring, particularly during choke point exercises.  (Achitoff Decl., Ex. 1.)

While the measures implemented by NDE I are too extensive to summarize here, the following are considered critical by this Court for purposes of

the instant matter:

(1) Only "taking" via Level B harassment was allowed; taking by Level A harassment (meaning serious injury or death) was prohibited;

(2) Extensive briefing and training for all exercise participants on marine mammal mitigation measures and NMFS-approved marine mammal observer training for watchstanders;

(3) All ships required to have lookout personnel with binoculars;

(4) All aircraft required to survey the area for marine mammals;

(5) Mandatory Power-Down: (a) 6 dB power-down when marine mammals were spotted within 1,000 meters of the sonar dome, maintained until the animal left the area, was not sighted for 30 minutes, or the vessel transited more than 2,000 meters from the location of the sighting; (b) 10 dB power-down when marine mammal detected within 500 meters of the sonar dome, maintained until the animal left the area, was not sighted for 30 minutes, or the vessel transited more than 1,500 meters from the location of the sighting; (c) shut-down of all sonar when marine mammal detected within or closing to within 200 meters of the sonar dome, maintained until the animal left the area, was not seen for 30 minutes, or the vessel transited more than 1,200 meters beyond the location of the sighting;

(6) in strong surface ducting conditions, a 6 dB power-down if a marine

mammal came within 2,000 meters of the source, a 10 dB power-down if an animal entered the 1,000 meter zone, and shut-down when an animal closed within 500 meters of the sound source;

(7)  in low visibility conditions, additional detection methods implemented, including infrared or enhanced passive acoustic detection;

(8) with the exception of three specific choke point exercises, no exercises in constricted channels or canyon-like areas;

(9) with the exception of the three choke point exercises, an exclusion zone of 25 kilometers of the 200 meter isobath;

(10) prior to initiating sonar activities, a 2,000 meter radius around the sound source to be cleared of marine mammals;

(11) extensive monitoring, reconnaissance, and observation measures. (Achitoff Decl. Ex. 1.)

### 3.  NDE II

On January 23, 2007, the Secretary of Defense issued the NDE II exemption for the Navy's sonar training covering the series of USWEXs challenged in this action, as well as the exercises scheduled to be conducted off the California coast that are now the subject of the Winter II litigation.  NDE II contains a total of 29 mitigation measures, many of them similar to those of NDE I.

According to Plaintiffs, however, NDE II eliminated many of the most crucial mitigation measures from NDE I, including, but not limited to: (1) power-downs during surface ducting conditions;[19] (2) coastal exclusion zones; and (3) protections for choke point exercises.  (See Revised EA at 5-8 to 5-12.)  NDE II maintained the power-down provision.  (Id.)

4. The Winter II Injunction

The district court imposed seven mitigation measures on the Navy for its California exercises.[20]  After briefly summarizing each measure, this Court will note the instant parties' stance relative to that measure.

(1)  12 Mile Coastal Exclusion Zone – The court found that the great weight of scientific evidence pointed to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals.  From the evidence presented to the court, it determined that the exclusion of a 12 mile zone

---

[19]     NDE II requires the same power-downs in surface ducting conditions as NDE I, but only when aggregated with additional factors (land masses surrounded by less than 35 nm and at least 10 nm in length, areas of rapid bathymetry change from 1,000–6,000 meters within short horizontal distance, and where multiple ships are operating MFA sonar in the same area over at least six hours and less than 10 nm apart).  (Declaration of Rear Admiral John M. Bird ("Bird Decl."),  ¶ 55, attached to Defs.' Second Supp. Opp'n to Pls.' Mot. for Prelim. Inj..)

[20]     The review of the district court's injunction is taken from NRDC v. Winter, – F. Supp. 2d –, 2008 WL 158330 (C.D. Cal Jan. 3, 2008).  The Court will not cite every reference made to this case.

adjacent to the coastline was both practicable and reasonably effective.  The court in that case noted that the Navy had adhered to a 25 nautical mile exclusion zone for RIMPAC 2006 off the coast of Hawai`i.  In addition, NDE I included a 12 nautical mile coastal exclusion zone.  The court determined that, while it was cognizant of the high density of marine life within 25 nm of the California coastline, a coastal exclusion zone of that size would unduly hamper the Navy's training efforts.

The parties in the instant matter disagree on the viability of this measure.

(2)  <u>2200 Yard MFA Sonar Shutdown</u> – The court ordered that the Navy cease use of MFA sonar (either vessel-based or aircraft-based) when marine mammals are spotted within 2200 yards.  The court was persuaded that the scheme proposed by the Navy was inadequate to protect marine mammals.  The court further found that studies indicated that sonar injuries marine mammals not only via acoustic harassment, but also by panic-induced rapid diving or surfacing, which leads to decompression sickness.

The parties in the instant matter disagree on the viability of this measure.

(3)  <u>Monitoring</u> – The court ordered the following monitoring measures:

(a) <u>Pre-exercise Monitoring</u> – Each day that MFA sonar is used, the court required the Navy to monitor for the presence of marine mammals for 60 minutes before employing MFA sonar.  If marine mammals are detected within 2200 yards, the Navy is required to wait until the animal either leaves the vicinity or the MFA sonar-transmitting vessel has transited at least 2200 yards away from the animals.

(b) <u>During Exercise Monitoring</u> – The court ordered the Navy to utilize two dedicated National Oceanic and Atmospheric Administration-("NOAA") and NMFS-trained lookouts at all times while MFA sonar is employed. To the maximum extent practicable, the Navy was ordered to employ passive acoustic monitoring to supplement the visual detection of the presence of marine mammals, specifically in areas where hard-to-locate beaked whales might be present.

(c) <u>Aerial Monitoring</u> – The court ordered the Navy to use aircraft already deployed for purposes of the exercise, as well as one dedicated aircraft, to assist in the monitoring for the presence of marine mammals.  Aerial monitoring was ordered to continue for the duration of exercises involving the use of MFA sonar.  Any spotting of marine mammals would be communicated to vessels

65

employing MFA sonar with all possible speed, to allow for the safety zone

requirement detailed above.

      The parties in the instant matter apparently agree that this measure is

workable and appropriate.

     (4)   <u>Helicopter Dipping Sonar</u> – The court ordered that, in addition to the

aerial monitoring described above, helicopters shall monitor for marine mammals

for 10 minutes before deployment of active dipping sonar.[21]  The same safety zone

considerations outlined above (2200 yards) apply to sonar-emitting helicopters as

well.

      The parties in the instant matter apparently agree that this measure is

workable and appropriate.

     (5)   <u>Surface Ducting Conditions</u> – The court determined that surface ducting,

in which sound travels further than it otherwise would due to temperature

differences in adjacent layers of water, are difficult to predict.  In addition to

making submarines difficult to detect, surface ducting causes the received decibel

level of sound to be higher at greater distances than otherwise would be expected.

Although not predictable, the court ordered that, when surface ducting conditions

---

      [21]     "Dipping" sonar refers to an MFA sonar device that is lowered from a
helicopter into the water where it releases a sonar ping.

are detected, the Navy shall power down sonar by 6 dB.

The parties in the instant matter disagree on the viability of this

measure.

(6)  <u>Chokepoints and the Catalina Basin</u> – Satisfied that the Catalina Basin

was a "choke point,"[22] despite the Navy's argument to the contrary, the court

ordered the Navy to refrain from employing MFA sonar there.

The parties in the instant matter disagree on the viability of this

measure.

(7)  <u>Continue NDE II Mitigation Measures</u> – Finally, the Court ordered the

Navy to continue to employ the mitigation measures listed in NDE II.  To the

extent that the requirements of the court's injunction conflicted, or were stricter

than, those measures, the court order controlled.

The parties in the instant matter apparently agree that this measure is

workable and appropriate.

5.  <u>Mitigation Measures Proposed by Plaintiffs</u>

Plaintiffs ask this Court to adopt all of the mitigation measures

imposed by the <u>Winter II</u> injunction, plus the following additional measures

---

[22]     A "chokepoint" is a strategic strait or canal characterized by a narrow
channel and lengthy shorelines that restrict maneuverability.  (Bird Decl. ¶ 57.)

67

specific to USWEX:[23]

(1) <u>Coastal Exclusion Zone</u> – Plaintiffs ask this Court to adopt the same coastal exclusion zone imposed by the district court in <u>Winter II</u> – 12 nm, meaning that no USWEXs could occur within that distance of any of the Hawaiian Islands. In the alternative, Plaintiffs request a depth-based exclusion zone, restricting sonar transmissions in waters less than 3,500 meters.

(2) <u>Avoid Cross Seamount</u> – According to Plaintiffs, seamounts are rich in biodiversity and, as a result, often attract aggregations of marine mammals. Citing the Revised EA, Plaintiffs claim that beaked whales are typically found near seamounts within the Hawai`i operating area and that these species are particularly vulnerable to injury from MFA sonar. Plaintiffs request a mitigation measure requiring the Navy to either "blank" sonar in the direction of Cross Seamount where practicable or reduce transmission levels by 3 – 6 dB when within five nm of Cross Seamount.

(3) <u>Avoid Training During Humpback Calving Season</u> – Plaintiffs request a measure restricting sonar use in the vicinity of the HIHWNMS from November 1 through May 1.

---

[23] The Court notes that some of the "additional" measures proposed by Plaintiffs are actually encompassed by the <u>Winter II</u> injunction. As such, the Court declines a redundant discussion of these measures.

68

(4)  <u>Avoid Choke Points</u> – Plaintiffs request mitigation preventing the Navy from conducting three planned USWEXs in reputed choke points – the Kaulakahi Channel between Kaua`i and Ni`ihau and in the Alenuihaha Channel between Maui and Hawai`i Island.

(5)  <u>Acoustic Monitoring</u> – Plaintiffs ask for a measure requiring the Navy to utilize the Pacific Missile Range Facility ("PMRF") underwater system of bottom-mounted hydrophones in order to detect whales before the area is ensonified.

(6)  <u>Regulate Power Levels</u> – Plaintiffs request a measure mandating the Navy to "ramp up" sonar levels prior to USWEXs, which would allow marine mammals to leave the area before transmissions reach harmful levels.

(7)  <u>Low Visibility Conditions</u> – Plaintiffs want the Navy to eliminate conducting USWEXs in low visibility conditions or, in the alternative, to power down by 10 dB in such conditions.

6.  <u>Defendants' Proposed Mitigation</u>

Defendants propose utilizing the 29 mitigation measures from NDE II, plus additional measures for USWEX that are specific to the Hawai`i Operating Area.  These additional measures[24] include:

------------------------------------------------------------

[24]  The Court notes that some of the measures Defendants offer as over and above the NDE II measures are actually encompassed by NDE II.

69

(1) <u>Expanding the Safety Zone</u> – The Navy will modify the NDE II safety zone provisions so that a power-down of 6 dB will occur if a marine mammal is detected within 1,000 meters (as opposed to yards) of the ship.  The Navy contends that this will increase the area of the safety zone by roughly 20%, or by over 615,000 square yards.  (Bird Decl. ¶ 80.)

(2) <u>Additional Lookouts</u> – The Navy will post two dedicated marine mammal lookouts on all surface ships during MFA sonar exercises, in addition to three non-dedicated watchstanders.  (<u>Id.</u> ¶ 81.)

(3) <u>Aerial Monitoring</u> – The Navy will have all aircraft involved in the exercises monitor the area for marine mammals and report confirmed sightings. (<u>Id.</u> ¶ 82.)

(4) <u>Continued Research</u>  – The Navy will continue to research measures that "seek to obtain more information about the quantity, distribution, migration, and behaviors of marine mammals to MFA sonar[.]" (<u>Id.</u> ¶ 84.)

(5) <u>Avoid Humpback Whales</u> – Pursuant to regulations promulgated by NMFS, the Navy will avoid operating any aircraft within 1,000 feet of any humpback whale; approaching, by any means, within 100 yards of a humpback whale; causing a vessel or other object to approach within 100 yards of a humpback whale; and disrupting the normal behavior or prior activity of a

70

humpback whale by any other act or omission.  (<u>Id.</u> ¶ 85.)

(6) <u>Avoid Papahanaumokuakea Marine National Monument</u> – Although the Hawai`i Range Complex encompasses the southern tip of the Papahanaumokuakea Marine National Monument and while the Navy believes it is legally justified in training in this area, the Navy will not conduct an exercise in this area during the March 2008 USWEX.  (<u>Id.</u> ¶ 86.)

In support of adhering to NDE II and the above measures, Defendants clarify that, contrary to what the Ninth Circuit determined in <u>Winter II</u>, the Navy did not eliminate the vast majority of the mitigation measures employed during RIMPAC 2006.  Instead, Defendants contend, the Navy analyzed the After Action Reports ("AAR") prepared after RIMPAC 2006 to develop the mitigation measures for NDE II.  NDE II therefore eliminated those measures from NDE I that were either ineffective, not feasible, or significantly interfered with the Navy's ability to train.  Defendants further assert that NDE II actually includes additional protective measures not part of NDE I; for example, a condition (number 26) was added requiring special precautions for beaked whales.

Furthermore, Defendants aver that the <u>Winter II</u> injunction is not warranted and would prevent the Navy from conducting effective and realistic training necessary to national defense.  Specifically, Defendants claim that the

71

following measures are inappropriate:

(1) <u>2200 Yard MFA Sonar Shutdown</u> – Defendants claim that this measure is unworkable because it would expand the Navy's current shutdown zone by 121 times and would severely degrade the utility of USWEX while affording marine mammals little additional protection beyond the safety zone scheme already employed by virtue of NDE II;

(2) <u>12 Nautical Mile Exclusion Zone</u> – Defendants assert that such an exclusion is not supported by science and would be unworkable in the Hawai`i Operating Area.  Instead, training in such areas is critical to simulating real world event scenarios that sailors are likely to encounter;

(3) <u>Surface Ducting</u> – Defendants argue that the 6 dB reduction required by the <u>Winter II</u> injunction will render MFA sonar testing ineffective, given that significant surface ducting conditions exist in Hawai`i.  Defendants contend that surface ducting in of itself is not proven to increase overall effects to marine mammals.  Moreover, training in surface ducting conditions, which provide shelter for submarines, is critical to developing combat-ready ASW skills.

(4) <u>Choke Point Exercises</u> – Defendants contend that training in choke points offers strategic benefits that are crucial and pose no undue threat to marine mammals.  Furthermore, the channels scheduled to be utilized in USWEX, while

not deemed to be choke points by the Navy, nevertheless do not resemble the channels from around the world that are suspected as having contributed to marine mammal injury.

IV.   The Injunction

Before issuing its injunction, the Court first notes that this is an extremely complex issue on which there is still much uncertainty.  While Defendants dispute the exact mechanism and factors associated with marine mammal stranding events associated with MFA sonar, there is little disagreement that MFA sonar can cause injury, death, and behavioral alteration to these animals.

Outside of this, however, there is little certainty.  Numerous unanswered questions complicate the discussion.  At what sonar levels do marine mammals exhibit behavioral changes?  Are these changes temporary or permanent?  Are certain species more susceptible to MFA sonar and, if so, why?  Where are these potentially sensitive species located?  Do other environmental conditions, either alone or in confluence, exacerbate the danger to marine mammals?  Are marine mammals negatively impacted at a greater level than those observed in stranding events?  These are just a sampling of some of the issues that, despite the parties best efforts, remain unanswered, at least decisively, at this time.

Nevertheless, the Court is in a position where a preliminary injunction

is warranted under the law but where the undeniable national security interest of

having a competently trained Navy in these uncertain times strongly militates

against stopping USWEX or stripping it of its usefulness.

As such, the injunction set forth below accounts for and balances what

the Court and the parties know – that avoidance of marine mammals and the

cessation of sonar when marine mammals are in proximity to the sonar source are

the only means of conclusively avoiding harmful affects on the animals – with the

issues that remain unresolved and the Navy's need to train.[25]

The Court also notes that the appeal of the <u>Winter II</u> injunction has

been heard by the Ninth Circuit and a decision is pending.  The Ninth Circuit's

decision *may* have implications on this case.  While an injunction order is always

open to motions for modification, if the parties here believe this injunction should

be modified based on the decision in <u>Winter II</u>, they are ordered to file motions for

modification within 15 days of the Ninth Circuit's ruling.[26]

---

[25]    Given the importance of this matter to both Plaintiffs and the
Department of Defense, this Court has exhaustively studied the facts in arriving at
these mitigation measures.  Indeed, this Court went so far as to conduct an on-site
view, with the parties' consent and presence of counsel, of MFA sonar aboard a
U.S. Navy Destroyer.

[26]    Due to the uncertainty of the timing of the Ninth Circuit ruling and the
imminent nature of the exercises this Order addresses, the Court does not have the
luxury of waiting for a Ninth Circuit decision.  In any event, it is uncertain given
the differences in circumstances here and in the California case what practical

Based on the evidence before it and the foregoing discussion, the Court orders that the Navy immediately implement the following mitigation measures:

(1) <u>Limited 12 Nautical Mile Coastal Exclusion Zone</u>

The weight of scientific evidence points to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals.  (<u>See</u> <u>generally</u> Bain Supp. Decl., Baird Supp. Decl., Parsons Supp. Decl, attached to Pls. Mitigation Brief.)  Similarly, scientific evidence suggests that beaked whales, which are typically found in near shore depths of less than 3,500 meters, are more susceptible to injury from MFA sonar.  (Baird Decl. ¶ 6.)  As such, avoidance of near shore areas is one generally accepted method of minimizing the potentially harmful effects of MFA sonar on species identified as particularly sensitive to such effects.

The Court, however, is cognizant of the Navy's need to train in littoral areas.  Clearly, one of the prime threats posed by quiet diesel-electric submarines is the ability to get close to shore without detection.  The Navy has previously recognized the value of adhering to exclusion zones, abiding by a 25 nm exclusion zone for RIMPAC 2006 and a 12 nm exclusion zone pursuant to NDE I.

--------------------------------

precedential impact that decision, once issued, will have.

75

While the Court notes that a 12 nm limit may be reasonable, the Court makes no definitive determination at this time because the Navy has indicated that the MFA sonar component of the March USWEX will occur no less than 40 nm from shore. As such, the issue is premature. Following the conclusion of the March USWEX, the Court will hear more from the parties on this issue and will further refine its injunction. Moreover, the Court will have the benefit of the Ninth Circuit's ruling in Winter II at that time.

(2) Safety Zone

The Navy shall observe the following safety zone: (a) when a marine mammal is spotted within 1,500 meters of any sonar-emitting vessel, the Navy will power down sonar by 6 dB, to be maintained until the animal has left the area, is not sighted for 30 minutes, or the vessel transits more than 1,500 meters from the location of the sighting; (b) when a marine mammal is spotted within 750 meters of any sonar-emitting vessel, the Navy will power down sonar by 10 dB, to be maintained until the animal has left the area, is not sighted for 30 minutes, or the vessel transits more than 750 meters from the location of the sighting; (c) when a marine mammal is detected within or closing to within 500 meters of the sonar dome, all sonar transmission is to cease, to be maintained until the animal has left the area, is not seen for 30 minutes, or the vessel transits more than 500 meters

76

beyond the location of the sighting.

Studies indicate that marine mammals change essential behavior in response to sounds received at levels in the 140 - 160 dB range (See Nowacek et al.)  Other studies indicate that injury to marine mammals occurs not only as a result of acoustic harassment, but by behaviorally-mediated mechanisms (e.g. rapid surfacing leading to the "bends.") (Bain Supp. Decl. at 8.)  Indeed, scientists have observed flight responses by marine mammals during naval exercises at distances as great as 40 kilometers.  (Id.)  These findings are highly persuasive that the safety zone described here, while far from a panacea, will likely provide protection from the harshest effects of MFA sonar.

(3)  Monitoring

(a)  Pre-exercise Monitoring – Each day that MFA sonar is used, the Navy shall monitor for the presence of marine mammals for 60 minutes before employing MFA sonar.  If a marine mammal is detected within 2,000 meters of the sonar source, the Navy will wait until: (1) the marine mammal is seen to leave the vicinity, (2) the MFA sonar-transmitting vessel has transited at least 2,000 meters away from the marine mammals; or (3) decrease sonar transmissions by 6 dB as specified in the safety zone discussion above.

(b)  During Exercise Monitoring – The Navy will utilize three

77

dedicated lookouts at all times while MFA sonar is employed in addition to its

normal watch component.  (<u>See</u> Parsons Supp. Decl. ¶ 7 (describing greater

mitigation measure compliance when specialist marine mammal observers are

present).)  To the maximum extent practicable, the Navy will employ passive

acoustic monitoring to supplement the visual detection of the presence of marine

mammals, specifically in areas where hard-to-locate beaked whales might be

present.  This includes utilizing PMRF's underwater, bottom-mounted

hydrophones to monitor for the presence of marine mammals when USWEX is

conducted in or around this area.

> (c) <u>Aerial Monitoring</u> – The Navy shall use aircraft already deployed

for purposes of the exercise, as well as one dedicated aircraft where practicable, to

assist in the monitoring for the presence of marine mammals.  Pre-aerial

monitoring shall be conducted within 60 minutes before the start of use of MFA

sonar.  Aerial monitoring shall continue for the duration of exercises involving the

use of MFA sonar.  Any spotting of marine mammals will be communicated to

vessels employing MFA sonar with all possible speed, to allow for timely

compliance with the safety zone requirement detailed above.

> (4)  <u>Helicopter Dipping Sonar</u>

> In addition to the aerial monitoring described above, helicopters shall

monitor for marine mammals for 10 minutes before deployment of active dipping

sonar.  In addition, if marine mammals are spotted within the 2,000 meter safety

zone described above, the same safety zone restrictions apply (i.e. 6 dB reduction if

marine mammal is within 2,000 meters, 10 dB reduction if marine mammal is

within 1,000 meters, and cessation of sonar if marine mammal is within 500

meters).

     (5) <u>Environmental Factors</u>

        The Navy shall power down MFA sonar by 3 dB when any two of the

following four factors are present, by 6 dB when any three are present, and will

cease utilization of MFA sonar when all four are present: (1) <u>rapid change in</u>

<u>bathymetry</u> – defined as "areas of at least 1,000 m depth near a shoreline where

there is a rapid change in bathymetry on the order of 1,000-6,000 meters occurring

across a relatively short horizontal distance (e.g., 5 nm)" (NDE II, Ex. 25 at 3,

attached to Defs.' Second Supp. Opp'n to Pls.' Mot. for Prelim. Inj.); (2) <u>multiple</u>

<u>sonar transmitting vessels</u> – defined as when "multiple ships or submarines ($\geq$ 3)

operating MFA [sonar] in the same are over extended periods of time ($\geq$ 6 hours)

in close proximity ($\leq$ 10 nm apart)" (<u>Id.</u> at 4.); (3) <u>chokepoint</u> – defined as an "area

surrounded by land masses, separated by less than 35 nm, and at least 10 nm in

length, or an embayment, wherein operations involving multiple ships/subs ($\geq$ 3)

employing MFA [sonar] near land may produce sound directed toward the channel or embayment that may cut off the lines of egress for marine mammals" (Id.); and (4) "the historical presence of a significant surface duct (i.e. a mixed layer of constant water temperature extending from the sea surface to 100 or more feet)." (Id.)

Pursuant to NDE II, the Navy is required to avoid training where possible when these four factors are present in the aggregate. (Id.) NMFS, however, has determined that all of these factors did not have to be present in order for the risk of stranding to be increased. In commenting on the Bahamas Report, NMFS noted that:

> [t]his report does not conclude that all five of these factors[27] must be present for a stranding to occur, nor that beaked whales are the only species that could potentially be affected by the confluence of the other factors. Based on this, NMFS believes that the presence of surface ducts, steep bathymetry, and/or constricted channels added to the operation of mid-frequency sonar in the presence of cetaceans (especially beaked whales and, potentially, deep divers) may increase the likelihood of producing a sound field with the potential to cause cetaceans to strand, and therefore, necessitates caution.

71 Fed. Reg. 38710, 38718-38719 (July 7, 2006). NMFS counsels caution when

---

[27]     The "fifth factor" is the presence of beaked whales. 71 Fed. Reg. 38710, 38718 (July 7, 2006).

these factors are present and the Court's increasing power down mitigation measure reflects this recommendation.

(6) Ramp Up Sonar Power

Before initiating any exercise utilizing MFA sonar, the Navy shall gradually "ramp up" sonar transmissions, with sound levels starting at sufficiently low levels and gradually increasing to allow marine mammals to depart the area before transmissions reach harmful levels.

While the parties have not provided much information on the viability of this measure, or lack thereof, the Court finds that it may be a practicable method of alerting marine mammals to potentially harmful sonar.  If, as much of the science suggests, marine mammals flee MFA sonar, then it is reasonable to assume that low, gradually increasing sonar sounds will cause these animals to depart the area from which this sound is originating.  The Court leaves it to the Navy's discretion as to how best to implement this measure in order to achieve the desired result.

The Court is not persuaded by the Navy's assertion that ramping up power will harm its training.  The Navy avers that ramping up would destroy the realism of the USWEX because submarines are able to detect the active sonar transmission of a surface vessel from a distance farther away than the surface ship

81

can detect the echo of its sonar off the submarine.  As such, the Navy claims, ramping up will eliminate the "cat-and-mouse" aspect so critical to ASW training.

This argument ignores a truth implicit in training exercises – training can never exactly simulate the conditions of warfare.  Although not mentioned in the parties' briefs, the Court believes that it is reasonable to assume that the submarine that will be the subject of the surface vessels' search in USWEX is, in actuality, one of the Navy's own vessels or a vessel of a friendly nation.  This Court sees no reason why the Navy could not ramp up sonar as a safety precaution, wait an appropriate amount of time, and then begin MFA portion of USWEX.  Surely, any alert that an "enemy" submarine might receive can be ignored for purposes of a practice event, especially in light of the very real threat to marine mammals.  To the Court, this seems like a relatively simple and logical measure that is not likely to cause the Navy significant, if any, imposition.  Further, it is not the "enemy" submarine's sonar operators' training which is critical but rather the Navy's.

(7) Continue NDE II Mitigation Measures

The Navy shall continue to employ the mitigation measures listed in NDE II.  To the extent that the requirements of this Order conflict with, or are stricter than, the NDE II mitigation measures, this Order controls.

(8) <u>Implement Navy's Measures Specific to USWEX</u>

The Navy shall employ the additional mitigation measures specific to USWEX.  Some of these measures, such as the expanded safety zone, dedicated lookouts, and aerial monitoring provisions, are obviated by this Order.  Other measures, such as the continuation of research and consultation, the avoidance of humpback whales, and the avoidance of the Papahanaumokuakea Marine National Monument, should be implemented beginning with the March 2008 USWEX.  As above, to the extent that the requirements of this Order conflict with, or are stricter than, the Navy's USWEX-specific mitigation measures, this Order controls.

Lastly, the Court recognizes that the March USWEX will implicate the above mitigation measures in varying degrees.  For example, as previously stated, it is the Court's understanding that all MFA sonar exercises will occur a minimum of 40 nm from shore.  Similarly, the Court understands that the Navy objects to the ramp up measure.  As such, the Court will entertain further proceedings in this matter following the March USWEX that will take into consideration the results of these exercises, including impacts on marine mammals, if any, and negative effects on the Navy's ability to train.  The Court will consider modification of the mitigation measures set forth in this injunction at

that time and will give due consideration to the Ninth Circuit's ruling in <u>Winter II</u>

as it may impact on this case.

CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and

DENIES IN PART Plaintiffs' Motion for Preliminary Injunction and ORDERS the

injunction described herein to issue immediately.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, February 29, 2008.



_____
David Alan Ezra
United States District Judge

<u>Ocean Mammal Institute, et al. vs. Robert M. Gates, et al.</u>, Civil No. 07-00254
DAE-LEK; ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; AND ORDER
SETTING INJUNCTION