IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | | |
|---|---|---|
| OCEAN MAMMAL INSTITUTE, et al., | ) ) ) | CIVIL NO. 07-00254 DAE-LEK |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| ROBERT M. GATES, et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR MODIFICATION OF THE COURT'S PRELIMINARY
INJUNCTION BASED ON THE MARCH 2008 USWEX

Pursuant to Local Rule 7.2(d), the Court finds this matter suitable for disposition without a hearing.  After reviewing the motions and supporting and opposing memoranda, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Modification of the Court's Preliminary Injunction Based on the March 2008 USWEX (Doc. # 122) and hereby modifies the Court's February 29, 2008 Preliminary Injunction, as modified by the Court's March 19, 2008 Order modifying the injunction, as set forth below.

BACKGROUND

The parties are familiar with the underlying facts of this case so the Court recounts them only briefly here.  Plaintiffs filed a Motion for Preliminary Injunction on August 22, 2007, which sought to enjoin the U.S. Navy ("Navy") from using mid-frequency active ("MFA") sonar, which Plaintiffs claim has deleterious effects on marine mammals, during Undersea Warfare Exercises ("USWEX") in the waters surrounding the Hawaiian Islands.  On February 29, 2008, this Court issued an Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction and Order Setting Injunction ("February 29 Order") (Doc. # 100).  The Court found that (1) Plaintiffs had a high likelihood of success on their National Environmental Policy Act ("NEPA") and Coastal Zone Management Act ("CZMA") claims; (2) there was a strong possibility that environmental harm would result should USWEX be allowed to continue while premised upon its current environmental analysis; (3) the balance of hardships tipped in favor of Plaintiffs; and (4) the public interest necessitated allowing the Navy not only to continue with USWEX, but to do so in a way that would not compromise its overall training objectives or the safety of its personnel.  The Preliminary Injunction ("Injunction") requires the Navy to implement eight mitigation measures in addition to those to which the Navy already adhered.

In March 2008, prior to the next scheduled USWEX, the parties separately moved for clarification and modification of the Injunction. On March 19, 2008, the Court issued an Order Modifying the Court's Order Setting Injunction ("Modification Order") (Doc. # 108), in which the Court clarified and modified in part the Injunction (the "Modified Injunction") pursuant to the parties' motions. The Navy conducted a USWEX in late March 2008.

On April 2, 2008, Defendants filed a notice (Doc. # 113) with the Court that the next two USWEXs were scheduled for May and June 2008, respectively. Defendants later supplemented this notice (Doc. # 118), stating that the first USWEX would occur in mid-May 2008, and that the second exercise would occur no later than early June 2008.

On April 23, 2008, Defendants filed the instant Motion for Modification of the Court's Preliminary Injunction Order Based on the March 2008 USWEX ("April 2008 Motion for Modification"). On May 2, 2008, Plaintiffs filed an Opposition (Doc. # 128), to which Defendants replied on May 5, 2008 (Doc. # 129).

On May 8, 2008, the Court held a status conference. The Court ordered the parties to meet and confer in an attempt to resolve their differences with respect to the instant motions. On May 9, 2008, the Court held another status

conference, at which the parties indicated that an agreement had been reached, the details of which are outlined below.

## DISCUSSION

I. Environmental Factors Condition

Defendants seek modification of the Modified Injunction based on the Navy's experience in applying the Modified Injunction during the March 2008 USWEX. Defendants claim that the surface ducting provision of the "environmental factors" condition ("E.F. Condition") caused a fundamental restructuring of the ship formation used during the March USWEX and thereby resulted in ineffective and flawed training. Specifically, Defendants claim that significant surface ducting conditions were detected more frequently than expected[1] and, in conjunction with the fact that multiple vessels were operating MFA sonar within 10 nm of each other for the duration of the exercise, the Navy was forced to alter the sonar transmissions of the vessels participating in the

---

[1] As set forth in its previous briefings to this Court, Defendants claim that previous analyses of over 11,000 measured temperature profiles around Hawai`i from 1941 to 2005 indicated a significant surface duct 53% of the time overall and 57% during the month of March. During the March 2008 USWEX, a significant surface duct was detected 100% of the time.

4

USWEX to the detriment of its training.[2] As a result, an entire complement of sailors on one vessel did not receive training on MFA sonar during the March USWEX. Moreover, Defendants aver that, because the USWEX was carried out in a manner that would not be used during combat, the Navy could not properly assess the participating strike group's capabilities, which is a fundamental objective of USWEX. In addition, Defendants assert that the Navy cannot use the results of the exercise to evaluate the Navy's MFA sonar techniques, tactics, and procedures, which is necessary to address the ever changing threat posed by quiet diesel electric submarines.

   Plaintiffs argue that the modifications sought by Defendants have been rejected by the Ninth Circuit in the related case of Natural Resources Defense Council, Inc. v. Winter, 530 F. Supp. 2d 1110 (C.D. Cal. 2008) ("Winter II"), aff'd 518 F.3d 704 (9th Cir. 2008). Furthermore, Plaintiffs contend that the existing surface ducting provision is already weak and minimally restrictive. Plaintiffs additionally aver that the evidence fails to support Defendants' suggestion that the existing surface ducting provision has forced it to sacrifice national security in the

---

[2] The commander of the March USWEX determined that two surface vessels operating MFA sonar at full power provided more sonar coverage than three surface vessels operating MFA sonar at decreased power. As a result, the commander ordered one ship to shut down MFA sonar and ordered the other two ships to maintain full sonar power.

past or will do so in the future.  Moreover, Plaintiffs argue that Defendants cannot show any likelihood of future harm.  Plaintiffs then suggest several options for the Court to consider with respect to limiting the risk from surface ducting conditions that they claim are more legally sound than those put forth by Defendants: (1) deny the motion and keep in place the existing surface ducting provision; (2) replace the existing surface ducting provision with the one that the Court had imposed in the original Injunction, which accounted for surface ducts as historically measured;[3] or (3) adopt the provision temporarily adopted by the Ninth Circuit in Winter II.[4]

---

[3] At Defendants' request, the Court modified the surface ducting provision it originally imposed so as to allow the Navy to account for surface ducting based on real time measurements.  See Modified Injunction at 12.

[4] In Winter II, the district court imposed an across-the-board 6 dB powerdown in strong surface conducting conditions.  This condition applied regardless of the presence of other environmental factors.  The Navy sought relief from this provision in its appeal to the Ninth Circuit.  The Ninth Circuit affirmed the district court's injunction but sua sponte issued a partial stay of the surface ducting condition during the pendency of the Navy's appeal to the Supreme Court. Winter, 518 F.3d at 705.
   The modified surface ducting condition imposed by the Ninth Circuit requires the Navy, when significant surface ducting conditions are detected, to reduce MFA sonar by 6 dB where a marine mammal is detected within 2,000 m of the sonar source, reduce MFA sonar by 10 dB where a marine mammal is detected within 1,000 m of the sonar source, and suspend its use of MFA sonar where a marine mammal is detected within 500 m of the sonar source.  Id. at 706.

This Court's Modified Injunction's E.F. Condition requires the Navy to power down MFA sonar by 3 decibels ("dB") when any two of the following four factors are present (for those vessels incapable of powering down by 3 dB, the Navy must power down by 4 dB when any two of the factors are present), by 6 dB when any three are present, and to cease utilization of MFA sonar when all four are present: (1) a rapid change in bathymetry of 1,000 to 6,000 meters ("m") occurring in waters at least 1,000 m deep near a shoreline over a relatively short horizontal distance, such as 5 nautical miles ("nm"); (2) multiple ships or submarines, meaning at least three vessels, operating MFA sonar simultaneously for 6 hours or more where the vessels are spaced 10 nm apart or less; (3) a channel surrounded by land masses separated by less than 35 nm, and at least 10 nm in length, or an embayment, wherein 3 or more ships are operating MFA sonar simultaneously and may direct sound towards the channel that may cut off the lines of egress for marine mammals; and (4) the presence of a significant surface duct, defined as a mixed layer of constant water temperature extending from the sea surface to 100 or more feet.

As the Court has stated previously, there is little certainty with regard to the issues presented in this case. While the evidence indicates a strong link between marine mammal injury and MFA sonar, the precise mechanism and degree

of impact remains very much in dispute.  Additionally, the Court is cognizant of the Navy's crucial role in protecting the Nation, the importance of training with MFA sonar as a defense against possible quiet diesel-electric submarine attack, and the potential impact significant alterations of this training would have on national security.  As a result of the complexity of these considerations, this Court has attempted, via both the Injunction and the Modified Injunction, to strike the appropriate balance between the protection of marine mammals and the Navy's need to train.

Defendants moved to completely eradicate the E.F. Condition.  This condition (1) was already amended by the Court in the Modified Injunction at Defendant's urging, and (2) is significantly less restrictive than not only the Winter II district court's surface ducting condition but also the Ninth Circuit's sua sponte modification of this condition.  In both cases, the Navy is obligated to power down MFA sonar by double what this Court has required (6 dB versus 3 dB).  Furthermore, with the exception of the visible presence of marine mammals in the Ninth Circuit's modification of the surface ducting condition, the Navy must power down MFA sonar absent any other environmental conditions.  Here, the Court's E.F. Condition requires such action only when surface ducting is present in conjunction with other factors that have been recognized by the National Marine

8

Fisheries Service as increasing the likelihood of producing a sound field with the potential to cause marine mammal strandings. The Court carefully considered the parties briefs and the scientific evidence, as well as the differences in locale and conditions between the waters implicated by the <u>Winter II</u> injunction and those here, before instituting the E.F. Condition. Subsequently, at Defendants' behest, the Court reconsidered the surface ducting provision and modified the condition accordingly.

        Defendants have presented this Court with no new information suggesting that the provisions of the E.F. Condition do not afford marine mammals additional protection. Moreover, Defendants did not provide the Court with an alternative proposal beyond the wholesale elimination of the E.F. Condition. While the Court recognizes the impact the E.F. Condition had on the March USWEX, Defendants' continued adherence to the uncompromising position of "we must train as we fight" remains unpersuasive. As the Court made clear at the May 8, 2008 status conference, the Navy does not exist in a vacuum. Context, whether financial, cultural, environmental, or otherwise, requires the Navy and other branches of the armed services to function in such a manner as to recognize considerations in addition to those related to military preparedness. Where, as here, there is a likelihood that the Navy has not adhered to federal law, it cannot

simply fall back on the training argument as a catch-all reason for avoiding its responsibilities.

Notwithstanding this discussion, pursuant to the Court's request that the parties take a second, hard look at the disputed issues here, the parties agreed at the May 9, 2008 status conference to a modification of the Modified Injunction that satisfies the parties' interests for purposes of the upcoming USWEXs without abandoning their overall pre-stated positions. Specifically, the parties agreed that the Ninth Circuit's modified surface ducting condition from <u>Winter II</u> was preferable to the existing E.F. Condition here. Based on this, the Court finds that elimination of the E.F. Condition and insertion of the Ninth Circuit's surface ducting condition is appropriate. The Court hereby modifies mitigation measure # 5, as set forth in the Modified Injunction, as follows (deleted section in strikeout and new section in italics):

> ~~(5) Environmental Factors~~
>
> ~~For those vessels capable of powering down by 3 dB, the Navy shall power down MFA sonar by 3 dB when any two of the following four factors are present (for those vessels incapable of powering down by 3 dB, the Navy shall power down by 4 dB when any two of the factors are present), by 6 dB when any three are present, and will cease utilization of MFA sonar when all four are present: (1) rapid change in bathymetry-defined as "areas of at least 1,000 m depth near a shoreline where there is a~~

~~rapid change in bathymetry on the order of 1,000-6,000 meters occurring across a relatively short horizontal distance (e.g., 5 nm)" (NDE II, Ex. 25 at 3, attached to Defs.' Second Supp. Opp'n to Pls.' Mot. for Prelim. Inj.); (2) multiple sonar transmitting vessels-defined as when "multiple ships or submarines (= 3) operating MFA [sonar] in the same are over extended periods of time (= 6 hours) in close proximity (# 10 nm apart)" ( Id. at 4.); (3) chokepoint-defined as an "area surrounded by land masses, separated by less than 35 nm, and at least 10 nm in length, or an embayment, wherein operations involving multiple ships/subs (= 3) employing MFA [sonar] near land may produce sound directed toward the channel or embayment that may cut off the lines of egress for marine mammals" ( Id.); and (4) the presence of a significant surface duct, as determined by the Navy (i.e. a mixed layer of constant water temperature extending from the sea surface to 100 or more feet). ( Id.)~~

To be replaced by:

*(5) Surface Ducting*

*When significant surface ducting conditions are detected by the Navy, the Navy shall reduce the MFA sonar level by 6 dB where a marine mammal is detected within 2,000 m of the sonar source, reduce the MFA sonar level by 10 dB where a marine mammal is detected within 1,000 m of the sonar source, and suspend its use of MFA sonar where a marine mammal is detected within 500 m of the sonar source. The Navy shall make good faith efforts to detect significant surface ducting conditions.*

II. Limited 12 Nautical Mile Coastal Exclusion Zone

In the original Injunction, the Court found that the weight of scientific evidence points to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals, specifically with regard to near-shore-dwelling beaked whales. The Court, however, determined that the imposition of a coastal exclusion zone was premature because the March USWEX would occur no less than 40 nm from shore. The Court invited the parties to further brief the issue following the conclusion of the March USWEX. As the Navy has indicated that the May and June USWEXs will occur, at least in part, in the the Barking Sands Undersea Range Extended ("BSURE"), which is a portion of the Navy's Pacific Missile Range Facility ("PMRF") located north of Ni`ihau and west of Kauai, and in the area south of Ni`ihau and Kaula, the Court finds that the issue is now ripe for decision.

Defendants urge the Court to not impose any coastal exclusion zone because training in near shore areas is crucial to USWEX. Defendants argue that access to BSURE and other ranges in the PMRF is vital because the tracking and recording instrumentation on these ranges is utilized by the Navy to track and assess the performance of the strike group during USWEX. Furthermore, Defendants argue that training in littoral areas is critically important because,

during deployment, a Naval strike group likely would be faced with transiting through such areas.  Defendants additionally contend that a coastal exclusion zone would negatively impact another common training scenario, which is conducting amphibious missions within sight of land, while also engaging enemy submarines and negotiating minefields.  As the PMRF is northwest of Kauai and within 12 nm of the coastlines of Kauai and Ni`ihau, a 12 nm coastal exclusion zone as contemplated by this Court in the Injunction would preclude the Navy from conducting sonar training in these examples.

      Plaintiffs argue that the Navy has not demonstrated that complying with the coastal exclusion zone issued in Winter II has been prejudicial to its training objectives.  Similiarly, Plaintiffs aver that the Navy has not shown that its past compliance with coastal exclusion zones in Hawai`i has resulted in any threat to national security.  Plaintiffs also allege that the Navy's internal documents establish that it is resistant to a coastal exclusion zone primarily because of a concern that such a restriction might be applied elsewhere, where conditions might be different.  As such, Plaintiffs ask the Court to adopt a tailored coastal exclusion zone precluding the Navy from conducting USWEX within 12 nm of shore, with the exception of training at the PMRF.

At the May 9, 2008 status conference, the parties agreed that a tailored 12 nm coastal exclusion zone was appropriate. As such, the Court adopts the language agreed upon by the parties and hereby inserts it into condition #1 of the Modified Injunction as follows (deleted section in strikeout and new section in italics):

> (1) <u>Limited 12 Nautical Mile Coastal Exclusion Zone</u>
>
> The weight of scientific evidence points to avoidance of marine mammal habitat as the most effective means of minimizing sonar-related injury to marine mammals. (<u>See</u> <u>generally</u> Bain Supp. Decl., Baird Supp. Decl., Parsons Supp. Decl, attached to Pls. Mitigation Brief.) Similarly, scientific evidence suggests that beaked whales, which are typically found in near shore depths of less than 3,500 meters, are more susceptible to injury from MFA sonar. (Baird Decl. ¶ 6.) As such, avoidance of near shore areas is one generally accepted method of minimizing the potentially harmful effects of MFA sonar on species identified as particularly sensitive to such effects.
>
> The Court, however, is cognizant of the Navy's need to train in littoral areas. Clearly, one of the prime threats posed by quiet diesel-electric submarines is the ability to get close to shore without detection. The Navy has previously recognized the value of adhering to exclusion zones, abiding by ~~a~~ *an* ~~25 nm~~ exclusion zone *of approximately 25 kilometers*[5] for RIMPAC 2006 and a 12 nm exclusion zone pursuant to NDE I.

---

[5] This change represents a correction of a factual error from the Court's original injunction and was similarly agreed to by the parties.

> ~~While the Court notes that a 12 nm limit may be reasonable, the Court makes no definitive determination at this time because the Navy has indicated that the MFA sonar component of the March USWEX will occur no less than 40 nm from shore. As such, the issue is premature. Following the conclusion of the March USWEX, the Court will hear more from the parties on this issue and will further refine its injunction. Moreover, the Court will have the benefit of the Ninth Circuit's ruling in Winter II at that time.~~
>
> *During the USWEX that commences on May 13, 2008, and the following USWEX that commences in or around June 2008, when using MFA sonar the Navy shall maintain a 12 nm exclusion zone from the Hawai'i coastline at all times, with the exception of two areas: (1) the Pacific Missile Range Facility (specifically in the instrumented Barking Sands Underwater ranges), which is north of Ni`ihau and west of Kauai; and (2) the area south of the Islands of Ni`ihau and Kaula, which is within 12 nm but not closer than 8 nm from the coast.*

As it has previously, the Court again notes for the record that it is amenable to further briefing on the conditions imposed by the Injunction following the conclusion of the upcoming USWEXs.

CONCLUSION

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Modification of the Court's Preliminary Injunction Based on the March 2008 USWEX and modifies the Injunction as set forth above. All other provisions remain unchanged.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, March 9, 2008.



_____
David Alan Ezra
United States District Judge

Ocean Mammal Institute, et al. vs. Robert M. Gates, et al., Civil No. 07-00254 DAE-LEK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR MODIFICATION OF THE COURT'S PRELIMINARY INJUNCTION ORDER BASED ON THE MARCH 2008 USWEX